J-A29023-14
J-A29046-14

2015 PA Super 3

IN RE: J.A., A MINOR              :   IN THE SUPERIOR COURT OF
                                      :       PENNSYLVANIA
                                        :
                                        :
                                        :
APPEAL OF: D.A., MOTHER       :   No. 682 WDA 2014

Appeal from the Order entered March 27, 2014,
Court of Common Pleas, Allegheny County,
Juvenile Division at No. 13-1136

---

IN RE: J.A., A MINOR              :   IN THE SUPERIOR COURT OF
                                        :       PENNSYLVANIA
                                        :
                                        :
                                        :
APPEAL OF: D.A., MOTHER       :   No. 1158 WDA 2014

Appeal from the Order entered June 18, 2014,
Court of Common Pleas, Allegheny County,
Juvenile Division at No. 13-1136

BEFORE:  FORD ELLIOTT, P.J.E., DONOHUE and WECHT, JJ.

OPINION BY DONOHUE, J.:            **FILED JANUARY 06, 2015**

D.A. ("Mother") appeals from two orders entered by the Allegheny County Court of Common Pleas (the "juvenile court").  The first appeal, docketed at 682 WDA 2014 (the "first appeal"), is from the March 27, 2014 order granting the motion of KidsVoice, guardian ad litem for J.A., appointing KidsVoice as J.A.'s medical guardian.[1]  As neither the Juvenile Act

---

[1] The term "medical guardian" appears nowhere in either the Juvenile Act or the Rules of Juvenile Court Procedure.  Our review of the record reveals that it is meant to describe a person with medical decision-making powers for a

nor the Rules of Juvenile Court Procedure permit this appointment, we vacate the juvenile court's order.[2]

The second appeal, docketed at 1158 WDA 2014 (the "second appeal"), pertains to the order entered on June 18, 2014. The basis of Mother's appeal from this order is the juvenile court's refusal to entertain testimony in support of Mother regaining medical decision-making rights for J.A. The juvenile court refused to do so pursuant to Rule of Appellate Procedure 1701, as the issue of the propriety of the appointment of KidsVoice as J.A.'s medical guardian was pending on appeal. Because the juvenile court may always enter orders in the child's best interest, we conclude that it erred by prohibiting questioning on that basis.

Also before this Court is a motion filed by KidsVoice seeking the dismissal of both of the aforementioned appeals on mootness grounds based upon the juvenile court's November 7, 2014 order appointing Mother as J.A.'s medical guardian. We conclude that although the November 7, 2014 order renders the appeals before us moot, the issues raised in the appeals

_____

dependent child. As this is the term used in the juvenile court's March 27, 2014 order, we likewise use it throughout this opinion.

[2] Following oral argument, the guardian ad litem submitted a request to file a post-submission communication pursuant to Pa.R.A.P. 2501 based upon her belief that she was unable to adequately answer a question posed during oral argument during her allotted time. We deny this request.

are capable of repetition and likely to evade review. We therefore deny KidsVoice's motion to dismiss the appeals.[3]

The record reflects the following facts and procedural history. The Allegheny County Office of Children, Youth and Families ("CYF") became involved with D.A. and her family on April 24, 2013, when it learned that J.A. (born in September of 2007) and her five minor siblings were residing with their 19-year-old sister.[4] Mother reportedly had been incarcerated since April 4, 2013 on charges of criminal homicide and aggravated assault for the death of J.A.'s biological father, D.J. On this basis, CYF filed a dependency petition on June 4, 2013, alleging that J.A. and her minor siblings were "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for [their] physical, mental, or emotional health, or morals[.]" Dependency Petition, 6/4/13, at 3; *see* 42 Pa.C.S.A. § 6302(1) (defining "Dependent Child"). The juvenile court entered an order the same day appointing KidsVoice as J.A.'s guardian ad litem ("GAL").

---

[3] On November 17, 2014, this Court entered an Order Per Curiam listing the second appeal before the argument panel that heard the first appeal and further ordered KidsVoice to supplement the record pursuant to Pa.R.A.P. 1926 with all documents preceding and pertaining to the juvenile court's entry of the November 7, 2014 order appointing Mother as J.A.'s medical guardian. Because our resolution of KidsVoice's motion necessarily disposes of the second appeal filed by Mother, we decide the cases in a single opinion.

[4] CYF acquired this information after two of J.A.'s minor siblings allegedly "got into a physical altercation." Dependency Petition, 6/4/13, at 3.

On August 6, 2013, the juvenile court granted CYF's request for a continuance, as CYF had additional concerns regarding alleged "unresolved medical issues with the children that may cause an amendment to the petition." Miscellaneous Order, 8/6/13. CYF filed an amended dependency petition on August 14, 2013, indicating that Mother was released from jail, was on house arrest and required financial assistance from CYF to pay utilities and rent, but was "becoming disinterested" with complying with services provided by CYF. Dependency Petition, 8/14/13, at 3. At the time of the filing of the amended petition, CYF was unable to obtain medical records for several of the children, including J.A., "due to the lack of information." *Id.*

The juvenile court held the adjudicatory hearing on August 28, 2013, at which Mother stipulated that the children were dependent pursuant to 42 Pa.C.S.A. § 6302(1). As stipulated by Mother, the juvenile court found that Mother was in need of assistance from CYF to provide proper care for and control of the children, particularly the medical needs of J.A., who had been diagnosed with Turner syndrome as an infant.[5] The juvenile court further

---

[5] According to the testimony of Dr. Jennifer Wolford of Children's Hospital of Pittsburgh, Turner syndrome is a condition that results in a female being born with a missing X chromosome. N.T., 6/18/14, at 55. In other words, while most females are born with two X chromosomes (XX), J.A. was born with only one X chromosome (XO). *Id.* Turner syndrome can cause a variety of medical and developmental problems, including problems with the cardiac and endocrine systems. *Id.* This diagnosis required J.A. to have

entered a dispositional order, leaving the children in Mother's physical custody and ordering, in relevant part, that Mother "attend to the children's medical needs[] and comply with the recommendations of Children's Hospital." Order of Adjudication and Disposition – Child Dependent, 8/28/13, at 2. In the August 28, 2013 order, the juvenile court neglected to indicate who had legal custody of J.A.[6]

Following the November 21, 2013 permanency review hearing, the juvenile court ordered, inter alia, that J.A. attend appointments with an endocrinologist and cardiologist. The juvenile court ordered that J.A. remain in Mother's physical custody, and remedied its prior omission by identifying CYF as the child's legal custodian.

Mother and the children failed to appear at the February 20, 2014 permanency review hearing. The juvenile court subsequently learned that they had been in a motor vehicle accident on their way to the hearing and that J.A. had been ejected from the car in which she was either an unrestrained or an improperly restrained passenger. At the rescheduled hearing on March 20, 2014, testimony revealed that J.A. remained

_____

heart surgery as an infant. *Id.* Turner syndrome is a lifetime disorder for which there is no cure. *Id.* at 60.

[6] Under "CUSTODY AND CONDITIONS," the juvenile court only addressed who had physical custody of the child, stating: "Physical custody of the child shall be with the mother, subject to the conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child." Order of Adjudication and Disposition – Child Dependent, 8/28/13, at 1.

hospitalized at Children's Hospital of Pittsburgh from the accident. According to the testimony of Dr. Jennifer Wolford, an attending physician in the Division of Child Advocacy of Children's Hospital, J.A. broke her femur and multiple facial bones, all of which Mother consented to having repaired. She had bruised lungs and several contusions, which were healing. She also had multiple central lines placed and a tracheostomy, to which Mother consented.

J.A. sustained her most significant and severe injury to her brain. As she was only six years old at the time of the accident, she still had a soft spot in her head, which she struck, resulting in the excess fluid not draining from her brain as it should. Doctors placed an external drain in J.A.'s head in an attempt to drain the fluid, but J.A. began having fevers. Because of the risk of infection, they clamped the external drain after 26 days, which, according to Dr. Wolford, was longer than an external drain usually stayed in place. Dr. Wolford testified that the standard of care called for the child to receive an internal drain, called a shunt, but that Mother would not give her consent. According to Dr. Wolford, this was a very common and relatively simple procedure. Dr. Wolford filed a Childline report alleging medical neglect by Mother, as her refusal to provide consent for this procedure was impeding J.A.'s recovery from her brain injury.

Dr. Wolford ordered an additional CT scan of J.A.'s brain the morning of the March 20, 2014 hearing, which "show[ed] extra fluid buildup actually

outside of her brain." *Id.* According to Dr. Wolford, this fluid buildup would eventually lead to too much pressure inside of J.A.'s brain. The procedure was urgent, but it had not yet become an emergent situation requiring immediate surgery. Dr. Wolford testified, however, that the situation could become life threatening at any time. Although she was unaware whether anyone had discussed with Mother the results of that morning's scan, Dr. Wolford testified that several doctors, herself included, had previously spoken with Mother about the need for a shunt and that Mother had not consented to the procedure, stating that she wanted to wait and see how J.A. did on her own. During her testimony, Mother indicated her belief that the swelling in the child's brain had reduced and that doctors clamped the external drain from the child's brain because it was no longer necessary.[7]

J.A. was also experiencing an inflamed gallbladder, which was reportedly causing the child a great deal of pain. Doctors wished to drain her gallbladder, but again, Mother would not consent to this procedure. Mother explained during her testimony that this was because she did not "want that much trauma on [J.A.]'s body right now." *Id.* at 49. Mother testified that she believed the cause of the inflammation to be that the hospital attempted to initiate feedings too quickly and thought that the provision of antibiotics would help. Mother did not think J.A. was

---

[7] The record reflects that Mother arrived late to the March 20, 2014 hearing and did not hear Dr. Wolford's testimony.

uncomfortable and testified that she believed that the doctors were taking the child off pain medications.

Mother testified that she was at the hospital almost the entire time J.A. was there. Mother stated that she was aware that a CT scan took place the morning of the hearing but that no one had spoken to her about the results. She testified that if, upon her return to the hospital, doctors informed her that J.A. still needed an internal shunt in her brain and to have her gallbladder drained, she was willing to consent to both procedures.

At the inception of the March 20, 2014 hearing, the GAL indicated that she planned to make an oral motion for KidsVoice to be appointed as J.A.'s medical guardian because of Mother's reported refusal to consent to the aforementioned procedures. The GAL withdrew this request at the conclusion of the hearing based upon Mother's stated willingness to provide the necessary consent. The juvenile court entered an order recounting Mother's agreement to consent to the procedures "once the situation is fully explained to her," and requiring that all of the children "receive all necessary medical, dental and eye care." Permanency Review Order (Non-Placement), 3/21/14, at 2.

On March 26, 2014, the GAL filed an emergency motion requesting the appointment of KidsVoice as J.A.'s medical guardian. In the motion, the GAL averred as follows:

a. [J.A.] has been in need of the internal shunt for her brain for over a week at this point. She has had two temporary drains placed, the most recent one over this past weekend because [J.A.] was literally "squirting brain fluid from her brain." The temporary drains cannot remain in place for extended periods of time because there is an extremely high risk of infection.

b. Mother indicated at the continued permanency review hearing on March 20, 2014 before Hearing Officer Hobson that she would be willing to sign consents if the procedures were still indicated after an updated ultrasound of the gallbladder and CT scan of the brain.

c. Updated diagnostics tests were performed and confirmed that the procedures were still necessary.

d. Mother spoke to the resident physician on Monday but insisted upon speaking to the attending neurosurgeon who was out of town until the following day.

e. Mother spoke to the attending neurosurgeon on Tuesday who again affirmed the need for the internal shunt.

f. Despite speaking to 4-6 different neurosurgeons on staff at Children's Hospital – Pittsburgh, Mother now is requesting a second opinion from a neurosurgeon who is not on staff at Children's.

g. [J.A.]'s medical condition, in the [pediatric intensive care unit], is too unstable to be transferred to another facility.

h. The doctor's [sic] believe that this procedure must be completed by Thursday, March 27, 2014[,] and have expressed this to [M]other.

i. [J.A.]'s condition is extremely life-threatening in that if she does not get the internal shunt, the brain fluid

> will collect in her brain and eventually cause her brain to herniate.  This will cause all life functions to cease.  A "best case" scenario would be a mere partial herniation resulting in probable severe and permanent brain impairment.
>
> j.  Mother has hesitated to sign releases based upon her belief that God will heal [J.A.] and not wanting to put [J.A.] through additional medical procedures if they are not necessary.
>
> k.  [J.A.] also requires her gallbladder to be drained as it is severely swollen and inflamed.
>
> l.  The gallbladder procedure is not necessary to save [J.A.]'s life[;] however, it is the cause of great pain and discomfort to this already severely injured and ill child.
>
> m. Mother has hesitated to sign for the gallbladder procedure since she herself has gallbladder problems and just deals with them.
>
> n.  Mother did consent to orthopedic surgery on [J.A.] for her broken femur.  Though an external fixation was the ideal medical procedure recommended, [M]other would only consent to an internal fixation because she did not want additional scarring on [J.A.]
>
> o.  Mother also consented to plastic surgery to repair some of the injuries to [J.A.]'s face and jaw.

Emergency Motion to Appoint Medical Guardian, 3/26/14, ¶ 4.  The GAL appended to the motion three reports authored by Dr. Wolford, which provided support for the above averments.  The GAL further averred that it was in J.A.'s best interest to have a medical guardian appointed to consent

- 10 -

to the necessary medical procedures; KidsVoice was willing to accept said appointment; and CYF was in agreement with this request.

The juvenile court held argument on the emergency motion the following day. At that time, the GAL reported to the court that J.A.'s situation had changed – that because the pressure in the child's brain was so great, she needed a "skull base repair[,] which involves widening the hole that connects the neck to the base of the skull," as opposed to just the placement of an internal shunt. N.T., 3/27/14, at 2-3. Counsel for Mother stated that Children's Hospital informed Mother of the need for the new procedure yesterday and that she planned to discuss it with the doctors that afternoon. Counsel for Mother objected to the appointment of a medical guardian, arguing that there is nothing in the law that permits such an appointment. Rather, counsel proposed that the juvenile court act according to Rule 1145 of the Rules of Juvenile Court Procedure and enter an order "for the treatment of [J.A.] for this particular instance[.]" *Id.* at 7. Mother did not request medical testimony in support of the motion or a continuance to be able to call witnesses in opposition to the motion. The juvenile court granted the GAL's motion and appointed KidsVoice as J.A.'s medical guardian. The March 27, 2014 order permitted KidsVoice to consent on J.A.'s behalf to "ordinary and extraordinary medical treatment and psychological/psychiatric treatment." Appointment of Medical Guardian Order, 3/27/14.

Mother filed a timely notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(1)(i). The juvenile court issued a written opinion pursuant to Pa.R.A.P. 1925(a)(1)(ii).

Following the appointment of KidsVoice as medical guardian, Attorney Amy Racunas of KidsVoice's guardianship unit[8] went to Children's Hospital, consulted with the relevant professionals, and then consented to the surgery required to repair the skull fracture that J.A. ultimately needed after blowing cerebral spinal fluid out of the base of her skull.[9] Because J.A. expelled so much fluid from her brain, the pressure in the child's head decreased, negating the need for a shunt at that time. J.A. required the removal of her gallbladder, which also occurred. Attorney Racunas further provided consent for J.A. to receive medication to relieve a blood clot found when doctors removed the cast from the child's leg. Mother reportedly wanted to "wait and see," but because of the potentially life-threatening nature of a blood

_____

[8] Attorney Racunas was the attorney serving as J.A.'s medical guardian. According to Attorney Racunas, a team of four attorneys and one supervising attorney comprise the guardianship unit of KidsVoice. N.T., 6/18/14, at 189. One of the five attorneys is available to address problems that arise on the guardianship cases on a twenty-four-hour basis. *Id.* All five attorneys in the guardianship unit have access to information on every child for whom KidsVoice serves as medical guardian and make decisions after consulting with the professionals on the case and reviewing the information contained in the child's file regarding any prior decisions made for the child's medical care. *Id.*

[9] Mother reportedly also consented to the procedure to repair J.A.'s skull, but it is unclear whether she did so before or after Attorney Racunas provided consent pursuant to her appointment as medical guardian. *See id.* at 84, 190.

clot, Attorney Racunas overrode Mother's decision and permitted the child to receive the medication.

Subsequently, the juvenile court held a permanency review hearing on June 18, 2014. Dr. Wolford testified as an expert in the fields of pediatrics, child maltreatment, child abuse, and child neglect. She provided detailed testimony regarding J.A.'s condition, including an overview of the child's four-to-six-week stay in the intensive care unit ("ICU") of the hospital, during which concerns arose about Mother "picking and choosing" which of the recommended treatments for J.A. she would provide her consent. N.T., 6/18/14, at 19-20. Dr. Wolford testified that although this would typically be acceptable for a parent to do, she explained that "when you are in an ICU setting after a severe traumatic brain injury, selecting or not selecting specific treatments are, frankly, detrimental to the forward movement of [the child's] progress and treatment." *Id.* at 20.

Dr. Wolford testified that Mother's refusal to consent to draining J.A.'s gallbladder, for example, resulted in the child experiencing pain, which they treat aggressively in the ICU because pain causes an increase in the patient's blood pressure and heart rate. The internal shunt became necessary when J.A. began experiencing high fevers, requiring the removal of the external drain in her brain. According to Dr. Wolford, the external drain was "an open track to infection," and an infection in her brain would have killed the child. *Id.* at 25.

As of the June 18, 2014 hearing, J.A. remained hospitalized, having transferred to the rehabilitation unit of Children's Hospital, which was located in the Children's Home. She was wheelchair bound and unable to sit independently, requiring restraints to keep her upright. The child could not move by herself in any respect, even to shift her weight in her chair. She was unable to attend to her own oral or physical hygiene and needed to be turned and moved to prevent bedsores and skin breakdown. She required braces on her ankles that had to be put on and removed according to a schedule to protect her skin. She received all of her nourishment and multiple daily medications through a G-tube that fed directly into her stomach. She could not take any food by mouth because of the risk of aspirating or choking. She could not watch television because it was not good for her brain injury recovery. Dr. Wolford testified that Mother either did not understand or did not follow the directions with respect to many aspects of the child's care.

While in the rehabilitation unit, J.A. received occupational therapy, physical therapy and speech therapy, each of which occurred one to three times every day. According to Dr. Wolford, Mother's participation in these therapies were critically important for the child, as "[J.A.] is going to make her best gains in [the] first six to twelve months," and Mother was going to have to continue working on the exercises with J.A. when the child returned home. *Id.* at 31-32. Mother reportedly only began regularly participating in

J.A.'s occupational and physical therapy sessions a few weeks before the hearing.

Dr. Wolford testified to her opinion that J.A. needed a calm, controlled environment in which she would receive consistent care twenty-four hours a day. She expressed concerns about Mother's ability to provide that environment at home based on the number of children in the house, Mother's response to several of J.A.'s treatment needs, and one disruptive incident that occurred involving J.A.'s older sibling, resulting in the sibling's removal from the hospital.

Mother's counsel attempted to cross-examine Dr. Wolford regarding the necessity of KidsVoice's appointment as J.A.'s medical guardian. Counsel for CYF objected to that line of questioning, citing Rule of Appellate Procedure 1701(b) for the proposition that the juvenile court could only maintain the status quo and was unable to alter its appointment of KidsVoice as medical guardian while the question of the propriety of that appointment was on appeal. The juvenile court informed Mother's counsel that if he was engaging in this questioning in the hopes of having medical decision-making rights returned to Mother, the court would not entertain such a request during the pendency of the aforementioned appeal. Counsel for Mother responded: "I appreciate the direction, because that was going to be one of my requests to return medical decision-making rights to [M]other based

- 15 -

upon [there] no longer being a need," and then abandoned that line of questioning. *Id.* at 88.

At the conclusion of the June 18, 2014 hearing, the juvenile court removed J.A. from Mother's physical custody and gave CYF permission to place the child "in a medically appropriate placement." Shelter Care Order, 6/18/14. It did not alter its order regarding KidsVoice's appointment as medical guardian for the child.

On July 10, 2014, counsel for Mother filed a motion seeking the juvenile court's reconsideration of its invocation of Rule 1701, asserting that "[the juvenile court]'s authority over J.A. under 42 Pa.C.S.A. § 6351 trumps Pa.R.A.P. 1701." Motion to Reconsider Re: 1701 Et Seq., 7/10/14, ¶ 11. The juvenile court held argument on the motion on July 15, 2014, at which a disagreement arose regarding precisely what transpired at the June 18, 2014 hearing on this issue. The juvenile court indicated that it would order the transcript and have counsel convene in chambers to review it together. Counsel for Mother requested that the juvenile court expressly grant reconsideration, without ruling on the merits of the motion, to toll the appeal period. The juvenile court did not. Thereafter, Mother filed a timely notice of appeal on July 18, 2014, concomitantly filing a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(1)(i). The juvenile court issued a written opinion pursuant to Pa.R.A.P. 1925(a)(1)(ii).

In the first appeal, Mother raises the following issues for our review, which we reordered for ease of disposition:

> [1.] Did the [juvenile court] abuse[] its discretion by making an error of law and acting manifestly unreasonable in appointing a [m]edical [g]uardian without legal authority to do so?
>
> [2.] Did the [juvenile court] abuse[] its discretion by making an error of law and acting manifestly unreasonable when it disregarded Pa. R.J.C.P. 1145?
>
> [3.] Did the [juvenile court] abuse[] its discretion by making an error of law and was [sic] manifestly unreasonable when abrogating its duty to exercise proper supervision of a dependent child?
>
> [4.] Did the [juvenile court] abuse[] its discretion by making an error of law and was [sic] manifestly unreasonable when it deprived [Mother] of her substantive and procedural due process rights to participate in her child's medical treatment without a showing in the record of her being unavailable, unwilling or incapacitated or even giving her a reasonable opportunity to respond to the allegations?

Mother's Brief (first appeal) at 6.

In the second appeal, Mother raises one issue for our review: "Did the [juvenile court] abuse its discretion by not applying the law and making a decision that was manifestly unreasonable by applying Pa.R.A.P. 1701 jurisdictional limitations on itself at a dependency permanency hearing?" Mother's Brief (second appeal) at 6.

As stated above, on November 7, 2014, the GAL filed a motion to dismiss as moot both of the pending appeals in this matter based upon the

juvenile court's November 7, 2014 order reinstating Mother's medical decision-making rights and ostensibly vacating KidsVoice's appointment as J.A.'s medical guardian.[10]  Prior to addressing the question of mootness, however, we must first determine whether the juvenile court had jurisdiction to enter the November 7, 2014 order.[11]

Pursuant to Rule of Appellate Procedure 1701, a lower court generally loses jurisdiction to proceed further in a matter after the filing of an appeal.[12]  Pa.R.A.P. 1701(a).  "Where only a particular item, claim or assessment adjudged in the matter is involved in the appeal, […] the appeal […] shall operate to prevent the trial court […] from proceeding further with

---

[10]  Although the November 7, 2014 order does not expressly terminate KidsVoice's appointment, the GAL acknowledges that KidsVoice is no longer appointed as J.A.'s medical guardian pursuant to that order.  **See** Motion to Dismiss for Mootness, 11/7/14, ¶ 3.  Our review of the record reveals that this was the juvenile court's intention.  **See** N.T., 11/7/14, at 101-02. Neither the juvenile court nor any party contends that the order did not terminate KidsVoice's appointment.

[11]  Although no party raised a question of the juvenile court's jurisdiction in response to the GAL's motion, "it is well established that questions of jurisdiction may be raised sua sponte." **Commonwealth v. Weathers**, 95 A.3d 908, 912 (Pa. Super. 2014) (citation omitted).  Additionally, we note that at the June 18, 2014 hearing, CYF raised the juvenile court's jurisdiction to terminate KidsVoice's appointment as J.A.'s medical guardian, at which time the court ruled that it did not have jurisdiction to enter such in order, in direct contravention to its later determination on November 7, 2014.

[12]  Rule 1701(b) sets forth actions the lower court may take while a case before it awaits appellate review, none of which apply or are relevant to the case at bar.  **See** Pa.R.A.P. 1701(b).

only such item, claim or assessment," unless the lower court or this Court otherwise orders. Pa.R.A.P. 1701(c).

In dependency matters, however, appellate courts in this Commonwealth have determined that the filing of an appeal does not necessarily divest the juvenile court of jurisdiction to proceed. Rather, following the appeal of a juvenile court's order in a dependency matter, "[t]he [j]uvenile [c]ourt maintains a continuing plenary jurisdiction in dependency cases under 42 Pa.C.S.A. § 6351[.]" *In re Griffin*, 690 A.2d 1192, 1200 (Pa. Super. 1997) (emphasis omitted) (quoting *In re Tameka M.*, 580 A.2d 750, 752 (Pa. 1990)). This is because depriving a juvenile court of jurisdiction in a dependency case following the filing of an appeal "would render the court powerless to prevent any abuse, no matter how egregious, of a dependent child at the hands of his custodian" and "would also frustrate the statutory authority of [the] [j]uvenile [c]ourt to exercise continuing independent and original authority to adjudicate in the best interests of a dependent child." *In re Griffin*, 690 A.2d at 1200 (citing *In re Lowry*, 506 Pa. 121, 127, 484 A.2d 383, 386 (1984)). "As the best interest of the children is always paramount, the continued finger of the trial court on the pulse of the case is needed, even while the matter is appealed." *In re H.S.W.C.-B*, 836 A.2d 908, 911 (Pa. 2003).

As the above case law indicates, the juvenile court is empowered to enter orders that are in the child's best interest consistent with the

mandates of section 6351 of the Juvenile Act,[13] even when the appeal of an order issued by the juvenile court in the matter remains pending. This is not to say that Rule 1701 is inapplicable in an appeal from an order entered in a dependency proceeding. To the contrary, we have cited to (and in some cases, relied upon) Rule 1701 in several appeals from dependency orders in reaching a resolution of the issues raised on appeal. *See, e.g., In re Adoption of R.K.Y.*, 72 A.3d 669, 675 (Pa. Super. 2013) (concluding, pursuant to Rule 1701(b)(1), that the juvenile court had jurisdiction to correct inadvertent errors made in its decrees terminating parental rights subsequent to the mother's appeal from the decrees), *appeal denied*, 76 A.3d 540 (Pa. 2013); *In re Griffin*, 690 A.2d at 1199 (relying in part upon Rule 1701(c) to conclude that the juvenile court had jurisdiction to conduct a contempt hearing concerning the foster parents' failure to abide by its dependency orders despite the fact that appeals were pending concerning the termination of the mother's parental rights to the subject

---

[13] Section 6351 of the Juvenile Act sets forth the scope of the juvenile court's dispositional and permanency review orders for a dependent child; persons and entities entitled to temporary and permanent legal custody of a dependent child; findings the juvenile court is required to make prior to removing a child from a parent's physical custody; placement options for a dependent child; considerations and mandates regarding sibling visitation; and requirements for permanency review hearings, including the frequency, required determinations and findings, and evidence the court must review. *See* 42 Pa.C.S.A. § 6351(a)-(c), (e)-(g). With the exception of a finding of aggravated circumstances (which requires a finding by clear and convincing evidence), all considerations under section 6351 are to be guided by child's best interest. *Id.*; *In re K.J.*, 27 A.3d 236, 241 (Pa. Super. 2011).

children and the removal of the children from the physical custody of a relative caregiver).

In the case at bar, it is undisputed that the juvenile court's November 7, 2014 order terminated KidsVoice's appointment as J.A.'s medical guardian, the propriety of which was on appeal before this Court in the first appeal. **See supra** n.10; N.T., 11/7/14, at 101-02. The November 7, 2014 order also constituted a reversal of the juvenile court's prior determination (on June 18, 2014) that Rule 1701 barred it from disturbing KidsVoice's appointment as medical guardian during the pendency of the first appeal, which ruling was the basis of the second appeal. As the November 7, 2014 order constitutes actions that Rule 1701 would generally prohibit, the juvenile court's jurisdiction to enter the order depends on whether it terminated KidsVoice's appointment as J.A.'s medical guardian pursuant to section 6351 and its determination that it was in the child's best interest. **See In re H.S.W.C.-B**, 836 A.2d at 911; **In re Griffin**, 690 A.2d at 1200.

The record reveals that at the November 7, 2014 review hearing held in this matter, a representative from Pediatric Specialty Care, where J.A. was placed following her discharge from Children's Hospital, testified that Mother and her eighteen-year-old son had been learning how to care for J.A. to prepare for the child's discharge from that facility. N.T., 11/7/14, at 29. She further testified regarding the details of the training and that although

Mother had not yet completed half of the requirements, she and her son were regularly visiting J.A. and participate in her care. *Id.* at 29-32, 52.

The child was medically stable at that time and Attorney Racunas testified that she had made no medical decisions for J.A. since the prior hearing. *Id.* at 32-33, 83. Attorney Racunas further testified to her understanding that J.A. was to have an Individualized Education Plan and that it would incorporate her physical and occupational therapy. *Id.* at 83-84. As Mother still had educational decision-making powers for J.A. and the school would require the signing of both educational and medical consents, it could potentially become confusing having one person responsible for making educational decisions and a different person responsible for making medical decisions. *Id.* at 84. Furthermore, as Mother was working toward the goal of having J.A. return to her physical custody, Attorney Racunas testified that she thought it would be best for the juvenile court to terminate KidsVoice's appointment as medical guardian at that time so that the juvenile court could ensure that Mother was able to make medically appropriate decisions for the child prior to J.A.'s discharge from Pediatric Specialty Care. *Id.* at 84-85. The Pediatric Specialty Care representative testified that she would call CYF and the GAL if Mother made medical decisions that were not in the child's best interest. *Id.* at 33.

At the conclusion of the hearing, the juvenile court stated, in relevant part:

> As far as the medical decision-making goes, let's give it back to mom – I mean, she is going to have to do it at some point anyhow – with the stipulation that if she is going to go against any type of medical opinions or what the doctors want to do, that [counsel for Mother] has to come in with a motion for that and we'll deal with it. But the hospital is going to have to let us know that she is going against their advice.

*Id.* at 101-02.

Although the juvenile court did not use the phrase "best interest of the child," the record supports a finding that it entered the November 7, 2014 order terminating KidsVoice's appointment as J.A.'s medical guardian based upon its conclusion that it was in the child's best interest to have Mother make medical decisions on her behalf while in a supervised setting since the goal was to have J.A. placed in Mother's custody upon her discharge. Thus, pursuant to existing precedent, we conclude that the juvenile court had jurisdiction to enter the November 7, 2014 order pertaining to medical decision-making rights for J.A.

The question remains, then, whether the November 7, 2014 order renders moot the two appeals pending before this Court.

> As a general rule, an actual case or controversy must exist at all stages of the judicial process, or a case will be dismissed as moot. An issue can become moot during the pendency of an appeal due to an intervening change in the facts of the case or due to an intervening change in the applicable law. In that case, an opinion of this Court is rendered advisory in nature. An issue before a court is moot if in ruling

upon the issue the court cannot enter an order that has any legal force or effect.

*In re D.A.*, 801 A.2d 614, 616 (Pa. Super. 2002) (en banc) (internal citations and quotations omitted). In each pending appeal, Mother asks this Court to reverse the juvenile court's decisions. *See* Mother's Brief (first appeal) at 23; Mother's Brief (second appeal) at 14. The juvenile court's November 7, 2014 order, however, already effectively granted the relief requested, as it terminated the prior appointment of KidsVoice as J.A.'s medical guardian. Thus, there is nothing for this Court to "reverse." As our decisions in these appeals would not have legal force or effect, we agree with KidsVoice that the November 7, 2014 order technically mooted both appeals. *See In re D.A.*, 801 A.2d at 616.

We conclude, however, that we are nonetheless able to decide both appeals, as they present questions that are "capable of repetition and apt to elude appellate review," and thus are excepted from the mootness doctrine. *In re M.B.*, 101 A.3d 124, 127 (Pa. Super. 2014) (citation omitted). There is nothing presently preventing the juvenile court from again appointing KidsVoice as the child's medical guardian. To the contrary, the record reflects that KidsVoice has a contract with the Allegheny County Court of Common Pleas to accept medical guardianship appointments in dependency cases when deemed necessary by the juvenile court. *See* N.T., 6/18/14, at 202. The GAL elicited testimony from the representative from Pediatric

Specialty Care that KidsVoice would be notified if there were any concerns about Mother's medical decision-making, and the juvenile court's statements on the record at the hearing suggest that its decision to appoint Mother as J.A.'s medical guardian was on a trial basis to see how she did in the role. *See* N.T., 11/7/14, at 33, 101-02. In short, KidsVoice could be reappointed as J.A.'s medical guardian at any time.

This issue is also apt to evade review. As this case illustrates, the question of what is in a child's best interest is a fluid concept, potentially changing throughout the life of a dependency case. For example, the juvenile court initially found that permitting Mother to make medical decisions on J.A.'s behalf was contrary to the child's best interest, but then mere months later determined it was in the child's best interest for Mother to regain medical decision-making powers for the child. A change in status can happen quickly for a medically needy child like J.A. Here, the termination of KidsVoice as medical guardian occurred a little more than a week after appellate oral argument in the first appeal.

Furthermore, our review of the record leads us to conclude that the juvenile court's decision to reverse itself on the applicability of Rule 1701 in this matter is prone to repetition yet likely to evade review. In rendering its decision on November 7, 2014, the juvenile court made no mention of its prior contrary ruling finding that Rule 1701 precluded it from even hearing testimony regarding the necessity of its appointment of KidsVoice as J.A.'s

- 25 -

medical guardian. There is nothing to suggest the juvenile court realized that it erred in its pervious application of Rule 1701, and therefore, there is nothing to suggest that the juvenile court cannot or will not misapply the law again in this case, only to reverse itself once appealed. Under these circumstances, including J.A.'s ongoing medical needs, we cannot forego reviewing this case. We therefore proceed to decide the merits of both appeals.

We begin with the second appeal. Mother contends that the juvenile court erred by prohibiting her counsel from presenting evidence to support the return of medical decision-making rights for J.A. to Mother, as the court failed to consider "the possibility that it would be in [J.A.'s] best interest for [Mother] to resume making medical decisions as to [the child's] care." Mother's Brief (second appeal) at 12. The juvenile court found that Rule 1701 precluded it from revisiting the question of medical decision-making rights for J.A. while the matter was on appeal. Juvenile Court Opinion, 8/29/14, at 5.[14] The juvenile court further found, in the alternative, as follows:

> There was no compelling testimony that [M]other was capable of caring for the child's medical needs. Even if the [c]ourt had not granted the supersedes [sic], there was ample testimony that [M]other still continues to be without the knowledge to care for

---

[14] The juvenile court did not paginate its opinion. For ease of reference, we have assigned numbers to the opinion beginning with the first page after the cover page.

> J.A. Mother's attempt to re-litigate the issue is misplaced. Furthermore, [M]other still continues [sic] faces major obstacles in caring for the child. Additional testimony revealed that [M]other had not remedied the situation which led to the appointment of the GAL as medical decision maker. The assertion that the shunt surgery is no longer medically necessary does alleviate the inability or unwillingness of [M]other to aid in the medical treatment of J.A.

Juvenile Court Opinion, 8/29/14, at 5-6.

The record reflects that counsel for CYF lodged an objection pursuant to Rule 1701 during Mother's questioning of Dr. Wolford on the necessity of KidsVoice's appointment as J.A.'s medical guardian. N.T., 6/18/14, at 85-86. The juvenile court agreed with counsel for CYF, stating, "If your only line of questioning here, [counsel for Mother,] is to give back the medical decision-making to mom, then I'm going to sustain her objection and we are going to move on because I'm not doing that. … Not while it's on appeal[.]" *Id.* at 88. Counsel for Mother then abandoned the line of questioning on that basis. *Id.*

As our discussion above makes clear, this ruling by the juvenile court was erroneous.[15] Although Mother had appealed the question of the propriety of the juvenile court's appointment of KidsVoice as J.A.'s medical guardian, the juvenile court had the authority – indeed, the obligation – to

---

[15] "Issues pertaining to jurisdiction are pure questions of law, and an appellate court's scope of review is plenary. Questions of law are subject to a *de novo* standard of review." *In re G.D.*, 61 A.3d 1031, 1037 (Pa. Super. 2013) (internal citations omitted).

- 27 -

continue entering orders in the child's best interest even during the pendency of an appeal. *See supra*, pp. 19-20. Although the juvenile court alternatively found that there was no testimony presented at the June 18, 2014 hearing supporting a finding that returning medical decision-making rights to Mother would be in the child's best interest, it fails to recognize that it precluded Mother from eliciting any such testimony. We therefore conclude that the juvenile court erred.

Turning to the first appeal, Mother's first three issues collectively challenge the juvenile court's authority to appoint KidsVoice as medical guardian to a dependent child.[16] Citing to the Rules of Juvenile Court Procedure and the Juvenile Act, Mother asserts that the law does not permit the juvenile court to make such an appointment, as it constituted an improper delegation of the juvenile court's duty to an organization that could not have legal custody of the child. *See* Mother's Brief (first appeal) at 12-16, 19-22. According to Mother, based upon the facts of the case, only the juvenile court or CYF could make medical decisions for the child. *Id.* at 20-22; Mother's Reply Brief at 2-5. We agree.

In its written opinion, the juvenile court solely relies on Rule of Juvenile Court Procedure 1145, stating that the Rule permits the appointment of "a medical decision maker if a parent is unavailable or

---

[16] As these issues are interrelated, we address them together.

unwilling to maintain such a role for the children." Juvenile Court Opinion, 5/30/14, at 4.[17] The court further made the following findings:

> While [M]other has been visiting with the child and [is] concerned with her condition, she had been unwilling to cooperate with hospital staff with regards to the child's medical needs. She is unable to fully understand the consequences of stalling the surgery which is vital to J.A.'s recovery. She has instead focused on unnecessary procedures, namely cosmetic surgery in an attempt to minimize the physical effects of the injuries. The doctors have repeatedly explained that the child was in a considerable amount of pain due to the swelling and inflammation of her gallbladder. Mother again advised medical staff that she wanted to "wait and see" if her condition improved. J.A. is suffering from a traumatic brain injury, and the medical staff at Children's Hospital has done the best they can to keep the child comfortable. The [c]ourt, GAL, and CYF have given mother ample opportunities to cooperate and assist in her daughter's medical treatment. However, [M]other continues to be an impediment to the child's level of comfort as well as her recovery.

*Id.* at 4-5.

The question before us requires that we interpret certain sections of the Juvenile Act and the Rules of Juvenile Court Procedure. This presents a question of law, for which our standard of review is de novo and our scope of review is plenary. *In re C.S.M.F.*, 89 A.3d 670, 675 (Pa. Super. 2014).

---

[17] Once again, because the juvenile court did not paginate its opinion, we have assigned numbers to the opinion beginning with the first page after the cover page.

- 29 -

The health, safety and welfare of a child involved in juvenile court proceedings is one of the foremost considerations contemplated by the Juvenile Act. *See* 42 Pa.C.S.A. § 6301(b)(1.1) (stating one of the purpose of the Juvenile Act is "[t]o provide for the care, protection, safety and wholesome mental and physical development of children coming within the provisions of this chapter"). To that end, the Juvenile Act gives the legal custodian of a child "the right to determine the nature of the care and treatment of the child, including ordinary medical care and the right and duty to provide for the care, protection, training, and education, and the physical, mental, and moral welfare of the child." 42 Pa.C.S.A. § 6357.[18] It is left to the juvenile court to carve out the precise conditions and limitations of the grant of legal custody, as well as to define the remaining rights and duties of the child's parent or guardian.[19] *Id.*

---

[18] We observe, as does Mother, that this definition of legal custody, contained in the Juvenile Act, differs from the same definition provided in the Child Custody Act, which defines legal custody as "[t]he right to make major decisions on behalf of the child, including, but not limited to, medical, religious and educational decisions." 23 Pa.C.S.A. § 5322.

[19] The term "guardian" is not defined by the Juvenile Act. It therefore has the definition provided in section 1991 of the Statutory Construction Act: "A fiduciary who legally has the care and management of the person, or the estate, or both, of another under legal disability." 1 Pa.C.S.A. § 1991 (stating that words or phrases used in a statute enacted on or after September 1, 1937 "shall have the meanings given to them in this section" unless the context of the statute "clearly indicates otherwise"). "Guardian" is not to be confused with the child's guardian ad litem, which section 1991 defines as "[a] fiduciary who is appointed to represent in legal proceedings another under legal disability." *Id.* Pursuant to the Juvenile Act, the

If the child's parent, guardian, or custodian[20] will not consent to the child's receipt of medical treatment, the juvenile court "may order the child to be examined at a suitable place by a physician or psychologist and may also order medical or surgical treatment of a child who is suffering from a serious physical condition or illness which in the opinion of a licensed physician requires prompt treatment[.]" 42 Pa.C.S.A. § 6339(b). The juvenile court may enter this order "even if the parent, guardian, or other custodian has not been given notice of a hearing, is not available, or without good cause informs the court of his refusal to consent to the treatment." *Id.* Therefore, it is clear in this case that the juvenile court could have ordered the shunt and gallbladder surgery J.A. required in light of the medical opinion of Dr. Wolford supporting the need for prompt treatment.

The Juvenile Act also specifically defines to whom the juvenile court may grant legal custody of a dependent child, thus defining who (other than the child's parent or guardian or the juvenile court) may make medical

---

guardian ad litem must be an attorney and is appointed by the juvenile court to represent the legal interests and the best interests of a child alleged to be dependent pursuant to 42 Pa.C.S.A. § 6302(1), (2), (3), (4), or (10). 42 Pa.C.S.A. § 6311(a). Section 6311(b) of the Juvenile Act sets forth the guardian ad litem's powers and duties, which do not include making medical decisions on the child's behalf. *See* 42 Pa.C.S.A. § 6311(b).

[20] The Juvenile Act defines "custodian" as "[a] person other than a parent or legal guardian, who stands in loco parentis to the child, or a person to whom legal custody of the child has been given by order of a court." 42 Pa.C.S.A. § 6302.

decisions on the child's behalf.  Section 6351(a)(2) limits the transfer of temporary legal custody of an adjudicated child to:

> (i) Any individual resident within or without this Commonwealth, including any relative, who, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child.
>
> (ii) An agency or other private organization licensed or otherwise authorized by law to receive and provide care for the child.
>
> (iii) A public agency authorized by law to receive and provide care for the child.

42 Pa.C.S.A. § 6351(a)(ii).

Pursuant to these sections of the Juvenile Act, the Pennsylvania Supreme Court promulgated Rule of Juvenile Court Procedure 1145, which states, in relevant part:  "After a petition [for dependency] has been filed, a motion for examination and treatment of a child may be filed."  Pa.R.J.C.P. 1145(B).  Nowhere in the plain language of the Rule is there any support for the juvenile court's conclusion that it can delegate medical decision-making authority to a third party that is not entitled to legal custody of a dependent child.  ***See*** Juvenile Court Opinion, 5/30/14, at 4.  To the contrary, the statutory sections upon which Rule 1145 relies clearly delineate who may make medical decisions for a dependent child.  ***See*** 42 Pa.C.S.A. §§ 6339(b) (the Juvenile Court), 6357 (the legal custodian); ***see also*** 42 Pa.C.S.A. § 6351(a)(2) (defining those authorized to be temporary legal custodian as

including an individual qualified to receive and care for the child; an agency or private organization licensed or authorized to receive and care for the child; or a public agency authorized by law to receive and care for the child).

Neither CYF nor the GAL suggests that KidsVoice qualifies as a person or entity to which the juvenile court may transfer temporary or permanent legal custody.[21] Instead, they point to the above-quoted purpose of the Juvenile Act contained in section 6301(b)(1.1) and to the broad prescription of section 6351 for juvenile courts to enter orders "best suited to the safety, protection and physical, mental, and moral welfare of the child," including limitations on a parent's right to custody of a child as the juvenile court sees fit for the child's protection, and the requirement that the juvenile court take into consideration any "[e]vidence of conduct by the parent that places the health, safety or welfare of the child at risk[.]"  42 Pa.C.S.A. § 6351(a)(1), (f)(6), (f.2), (g);[22] *see* CYF's Brief at 17-18, 21-22; GAL's Brief at 11-15.

---

[21]  KidsVoice is a nonprofit agency that represents nearly 3000 abused, neglected and at-risk children in Allegheny County.  KidsVoice does yeoman's work to help its clients, assisting them in many facets of their lives. Teams of attorneys and child advocacy specialists work together to advocate for KidsVoice's clients both in dependency proceedings in court and in the community to ensure their health, safety, welfare, and educational needs are met, and to help them successfully transition out of the child welfare system to live independently.  KidsVoice further helps its clients navigate social security matters and provides representation for clients who receive minor criminal citations and in proceedings to expunge juvenile delinquency records.  *See* https://kidsvoice.org (last visited Jan. 5, 2015).

[22]  The 6351 subsections relied upon by CYF and/or the GAL in their respective responsive briefs state:

We note that the Supreme Court relied upon section 6301(b)(1.1) as the legal predicate for Rule of Juvenile Court Procedure 1147, which authorizes the appointment of an educational decision maker for a dependent child. *See* Pa.R.J.C.P. 1147, *Comment*. In evaluating the

> **(a) General rule.--**If the child is found to be a dependent child the court may make any of the following orders of disposition best suited to the safety, protection and physical, mental, and moral welfare of the child:
>
> (1) Permit the child to remain with his parents, guardian, or other custodian, subject to conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child.
>
> * * *
>
> **(f) Matters to be determined at permanency hearing.--** At each permanency hearing, a court shall determine all of the following:
>
> * * *
>
> (6) Whether the child is safe.
>
> * * *
>
> **(f.2) Evidence.--**Evidence of conduct by the parent that places the health, safety or welfare of the child at risk, including evidence of the use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk, shall be presented to the court by the county agency or any other party at any disposition or permanency hearing whether or not the conduct was the basis for the determination of dependency.
>
> **(g) Court order.--**On the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351 (a)(1), (f)(6), (f.2), (g).

arguments advanced by the GAL and CYF, we find it significant that the Supreme Court did not also adopt a rule expressly permitting the appointment of a medical decision maker, or even reference section 6301(b)(1.1) in the comment to Rule 1145. Rule 1147 sets forth in copious detail when the appointment of an educational decision maker is appropriate and the duties, responsibilities and qualifications of an appointee. ***See*** Pa.R.J.C.P. 1147.[23] Although decisions regarding a child's education are

---

[23] Rule 1147 provides:

> **A. Generally.** At any proceeding or upon motion, the court shall appoint an educational decision maker for the child if it determines that:
>     (1) the child has no guardian; or
>     (2) the court, after notice to the guardian and an opportunity for the guardian to be heard, has made a determination that it is in the child's best interest to limit the guardian's right to make decisions regarding the child's education.
> **B. Notice of hearings.** The educational decision maker shall receive notice of all proceedings.
> **C. Duties and responsibilities.** The educational decision maker shall:
> (1) make appropriate inquiries and take appropriate actions to ensure that:
>     (a) issues concerning the child's educational stability are addressed;
>     (b) school discipline matters are addressed;
>     (c) the child is receiving appropriate education that will allow the child to meet state standards, including any necessary services concerning special education in the least restrictive environment, or remedial services;
>     (d) the child, who is sixteen years of age or older, is receiving the necessary educational services to transition to independent living;

unquestionably important, medical decisions can have immediate life-or-death consequences. It seems incongruous for the Supreme Court to delineate precisely who may make educational decisions for a dependent child, but then leave entirely to chance the criteria for the appointment of a

> (e) the child, who is receiving services concerning special education, is engaged in transition planning with the school entity beginning no later than the school year in which the child turns fourteen; and
>
> (f) the child, who is aging out of care within ninety days, has a transition plan that addresses the child's educational needs, and if applicable, the plan is coordinated with the child's transition planning concerning special education under the Individuals with Disabilities Education Act.
>
> (2) address the child's educational needs by:
>
> (a) meeting with the child at least once and as often as necessary to make decisions regarding education that are in the best interests of the child;
>
> (b) participating in special education and other meetings, and making decisions regarding all matters affecting the child's educational needs in a manner consistent with the child's best interests;
>
> (c) making any specific recommendations to the court relating to:
>
> > (i) the timeliness and appropriateness of the child's educational placement;
> >
> > (ii) the timeliness and appropriateness of the child's transitional planning; and
> >
> > (iii) services necessary to address the child's educational needs;
>
> (d) appearing and testifying at court hearings when necessary; and
>
> (e) having knowledge and skills that ensure adequate representation of the child.

Pa.R.J.C.P. 1147.

medical decision maker if the law contemplated such a surrogate medical decision maker.

Based on our analysis of the Juvenile Act, it is clear that the legislature did not contemplate a surrogate medical decision maker since it specifically identified the persons or entities capable of making medical decisions for dependent children: the child's parents, the child's legal guardian, and the child's legal custodian. *See* 42 Pa.C.S.A. §§ 6339(b), 6357; *see also* 42 Pa.C.S.A. § 6351(a)(2). If any of those empowered to make medical decisions on the child's behalf refuse or fail to do so, the legislature made it the role of the juvenile court itself to order that the child be examined by a physician or psychologist or order the medical or surgical treatment of a child who is suffering from a serious physical condition which in the opinion of a licensed physician requires prompt attention. 42 Pa.C.S.A. § 6339(b).

As the parties recognize, this Court recently affirmed the appointment of a temporary medical guardian in a dependency matter. *See In re J.J.*, 69 A.3d 724, 734-35 (Pa. Super. 2013). Relying, in large part, on the reference in the comment to Rule 1145 to section 6357 of the Juvenile Act, we affirmed the juvenile court's temporary appointment of the children's relative caregivers as their medical and educational decision makers. *Id.* at 733, 734-35. Importantly, the father in *In re J.J.* did not challenge the juvenile court's authority to appoint a medical guardian, but raised the issue of whether the juvenile court erred by appointing an educational and medical

decision maker for his children absent proof that he was unwilling or unavailable to make those decisions for his children. *Id.* at 728, 732. Thus, *In re J.J.* has no precedential value on the question before us in the case at bar.

Moreover, a critical distinction between *In re J.J.* and the case before us is that the relative caregivers appointed as medical guardians for the children in *In re J.J.* lawfully qualified to be appointed as temporary legal custodians of the children pursuant to section 6351(a)(2)(i) of the Juvenile Act. *See id.* at 733. The juvenile court therefore could properly authorize them to make medical decisions for the children pursuant to section 6357 of the Juvenile Act. *See* 42 Pa.C.S.A. § 6357.

As stated above, the Juvenile Act states that the legal custodian is the only person or entity, apart from the juvenile court or the child's parent or guardian, who may make medical decisions for a dependent child. *See* 42 Pa.C.S.A. §§ 6351(a)(2), 6339(b), 6357. The Rules of Juvenile Court Procedure follow accordingly. *See* Pa.R.J.C.P. 1145, *Comment*. In the absence of a legislative enactment stating otherwise, no person or entity outside of that defined category may make medical decisions on behalf of a dependent child. *See* 1 Pa.C.S.A. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."); 1 Pa.C.S.A. § 1933 (stating that if a general provision of a statute is in conflict with a specific provision and

effect cannot be given to both, the specific provision prevails and must be construed as an exception to the general provision); *see also* Pa.R.J.C.P. 1101(D) (stating that the Rules of Juvenile Court Procedure "shall be construed in consonance with the rules of statutory construction").

In appointing KidsVoice as J.A.'s medical guardian, the juvenile court undoubtedly relied on the reputation and expertise of KidsVoice.[24] We do not deny KidsVoice's reputation or its expertise; because of its mission, it may be that KidsVoice (and agencies like it throughout Pennsylvania) is in all other respects an appropriate entity to make medical decisions for a dependent child. The Juvenile Act and the Rules of Juvenile Court Procedure simply do not permit its appointment as a child's medical guardian.

The juvenile court could have ordered that the child undergo the recommended procedures. *See* 42 Pa.C.S.A. § 6339(b). CYF or the GAL could have brought that motion before the juvenile court at any time. *See* Pa.R.J.C.P. 1145(B). Nonetheless, the GAL's concern is well founded that in a case like this, where the child's medical needs were significant, ongoing, and changing regularly, seeking the juvenile court's approval every time consent for J.A.'s medical treatment was necessary could have become "untenable and a significant detriment to J.A.'s treatment and recovery[.]" GAL's Brief at 15. The inability to appoint KidsVoice as the child's medical guardian, however, does not leave the juvenile court as the only entity that

---

[24] *See supra* n.21.

has the authority under the law to consent to medical treatment for a dependent child if the parent or guardian cannot or will not do so.

CYF, unlike KidsVoice, qualifies as an agency entitled to act as the child's temporary legal custodian. *See* 42 Pa.C.S.A. § 6351(a)(2)(iii); *see also* 62 Pa.C.S.A. § 2305 (relating to the powers and duties of local authorities as to children); 42 Pa.C.S.A. § 6301 (indicating that the county children and youth agency is the local authority set forth in 62 Pa.C.S.A. § 2305). In fact, CYF was J.A.'s legal custodian in this case. *See* Permanency Review Order (Non-Placement), 11/27/13, at 2; *supra* p. 5. As we have explained, pursuant to section 6357 of the Juvenile Act, the legal custodian has "the right to determine the nature of the care and treatment of the child, including ordinary medical care and the right and duty to provide for the care, protection, … and the physical, … welfare of the child." 42 Pa.C.S.A. § 6357. The juvenile court must determine the "conditions and limitations" of the grant of legal custody and "the remaining rights and duties of the parents or guardian of the child." *Id.* Therefore, under the law, the juvenile court could have entered an order permitting CYF to consent to all medical treatment for J.A.

Both Mother and the GAL agree that the law permits CYF to make all medical decisions for a dependent child in its legal custody. Mother's Reply Brief at 4-5; GAL's Brief at 24. The GAL indicates, however, that it is CYF's "longstanding practice" to provide consent only for routine medical care.

GAL's Brief at 24-25. The record supports this assertion. *See* Emergency Motion to Appoint Medical Guardian, 3/26/14, ¶ 7 (stating that "[CYF] is in agreement with the appointment of KidsVoice as medical guardian to [J.A.]"); N.T., 3/20/14, at 33-34 (CYF caseworker testifying that "in the event that [Mother] does not consent, if [J.A.] needs these surgeries, then [CYF] would … ask for a medical educational [sic] guardian."). In its responsive brief on appeal, CYF denies that it could consent to the surgical procedures recommended for J.A. based on section 3130.91 of the Public Welfare Code, as the procedures constituted "nonroutine treatment" and were beyond CYF's authority to consent. CYF's Brief at 22-23. In so concluding, CYS ignores or misinterprets section 6357 of the Juvenile Act.

Section 3130.91 of the Public Welfare Code permits CYF to make all "routine" medical decisions for a child in its legal custody.[25] 55 Pa. Code § 3130.91(2)(i). CYF typically must obtain the consent of either the child's parent or the juvenile court (if the parent is unavailable or refuses to consent) prior to the child undergoing "nonroutine" treatment.[26] *See* 55 Pa.

---

[25] "Examples of routine treatment include well baby visits, immunizations and treatment for ordinary illnesses." 55 Pa. Code § 3130.91(1)(i).

[26] "Examples of nonroutine treatment include nonemergency surgery, cosmetic surgery and experimental procedures or treatment." 55 Pa. Code § 3130.91(1)(ii). For emergency treatment, the Code directs CYF to "immediately take the child to a physician for treatment. It is not necessary to obtain or provide consent when, in the physician's judgment, an attempt to secure consent would result in delay of treatment which would increase the risk to the child's life or health." 55 Pa. Code § 3130.91(3).

Code § 3130.91(2)(ii), (iii). As already noted, the Juvenile Act permits the juvenile court to empower the legal custodian (here, CYF) to make all medical decisions – both routine and nonroutine – for a dependent child. *See* 42 Pa.C.S.A. § 6357. Although we see no inherent conflict between the Code and the Juvenile Act, to the extent that section 3130.91 of the Public Welfare Code conflicts with the Juvenile Act, the statutory enactment prevails. *See In re Lowry*, 484 A.2d at 386-87 (finding that unless acting "in the role of adjudicator reviewing the action of an administrative agency," the juvenile court is not bound by Public Welfare Code, but must instead follow the Juvenile Act). As such, if CYF, the GAL, and/or the juvenile court are concerned that Mother's unwillingness to consent to necessary medical treatments for J.A. will continue and that seeking the juvenile court's approval for every necessary medical intervention is not in the child's best interest, the law permits the juvenile court to grant CYF, as temporary legal custodian, the authority to make all medical decisions for the child. The juvenile court's appointment of KidsVoice as J.A.'s medical guardian, however well intentioned, is unsupportable under the law.

Next, Mother challenges the juvenile court's failure to conduct a hearing prior to appointing a medical guardian, asserting that this constituted a deprivation without due process protections. Mother's Brief (first appeal) at 16-18. Our review of the record reveals that the March 27, 2014 argument on KidsVoice's motion, Mother did not request a hearing,

medical testimony in support of the motion, or a continuance to call her own witnesses in opposition to the motion. The first time she raised this contention was at the June 18, 2014 hearing. *See* N.T., 6/18/14, at 87.

> In order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court. Failure to timely object to a basic and fundamental error will result in waiver of that issue. On appeal[,] the Superior Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected. In this jurisdiction ... one must object to errors, improprieties or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter.

*In re S.C.B.*, 990 A.2d 762, 767 (Pa. Super. 2010) (citation omitted). We therefore find this claim waived.

In summary, although the issues raised on appeal are technically moot, they are capable of repetition yet likely to evade review, thus permitting this Court to reach the merits of both appeals. We further conclude, based on the facts of the case, that the juvenile court erred by finding that Rule of Appellate Procedure 1701 precluded it from revisiting the question of the appointment of a medical guardian for the child while the question of the propriety of the appointment was pending on appeal. Lastly, we are compelled to find that the juvenile court erred by appointing KidsVoice as J.A.'s medical guardian, as its appointment is unsupportable

under the Juvenile Act and/or the Rules of Juvenile Court Procedure. As the juvenile court's November 7, 2014 order only terminated KidsVoice's appointment, we vacate the March 27, 2014 order.

March 27, 2014 order vacated. Petition for Leave to File Post-Submission Communication denied. Motion to Dismiss for Mootness denied. Case remanded. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/6/2015