J-S66001-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.V., A MINOR A/K/A Z.S.V. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.S., MOTHER | : | No. 3659 EDA 2017 |

Appeal from the Orders October 4, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000552-2016,
CP-51-DP-0001269-2015

BEFORE:  GANTMAN, P.J., PANELLA, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY GANTMAN, P.J.:                    **FILED DECEMBER 18, 2018**

Appellant, D.S. ("Mother"), appeals from the orders entered in the Philadelphia County Court of Common Pleas, which reaffirmed the court's prior decree terminating Mother's parental rights to her minor child, Z.V. a/k/a Z.S.V. ("Child") (born November 2008), and the court's prior order changing Child's permanency goal to adoption.  We affirm.

A prior opinion of this Court sets forth the relevant facts and procedural history of this case as follows:

> On May 10, 2015, [the Department of Human Services ("DHS")] obtained an order of protective custody ("OPC") regarding Child based on reports that Mother repeatedly hit Child with different implements.  Following a shelter care hearing, the trial court granted DHS legal and physical custody over Child.  Child was initially placed with Child's maternal grandmother.
>
> On May 15, 2015, DHS filed a dependency petition regarding Child.  DHS asserted aggravated circumstances, namely,

the involuntary termination of Mother's parental rights to Child's sibling. On May 27, 2015, the trial court adjudicated Child dependent and set a permanent placement plan of "return to guardian." The court referred Mother to the Clinical Evaluation Unit for a drug screen and a dual diagnosis assessment.

On July 29, 2015, following a permanency review hearing, the trial court entered an order indicating Mother did not meet the criteria for substance abuse intervention. The court referred Mother to Behavioral Health Systems for a consultation or evaluation and directed the Community Umbrella Agency ("CUA") to refer Mother to anger management counseling. The court directed that Child be placed in foster kinship care with Child's maternal aunt.

On December 16, 2015, the trial court convened a permanency review hearing. At the beginning of the hearing, DHS's counsel indicated that a ruling on DHS's allegations of aggravated circumstances had been deferred. DHS entered copies of a September 29, 2004 order involuntarily terminating Mother's parental rights to Child's sibling into the record. DHS's counsel requested that DHS make no reasonable efforts toward reunification. Following arguments by Mother's counsel, the court directed that "no reasonable efforts are needed."

DHS presented additional testimony from Child's CUA case manager, who indicated that visitation had been suspended based on the recommendation of Child's therapist. Mother's counsel objected suggesting that DHS did not present evidence of a grave threat to Child. In response, DHS presented the case manager's testimony that Child reported (1) her sibling sexually abused her when Child and sibling were in Mother's care, (2) Mother and Child's sibling taught Child sexual behaviors, and (3) Child placed a firearm against her own head because her Mother told Child she was "bad." DHS's counsel indicated that child protective services reports were made in September, and the matter was "being investigated." Moreover, DHS's counsel averred, "I believe [the reports] have been substantiated." The court determined that visitation with Mother constituted a grave threat to Child and ordered visitation be permanently suspended unless it occurred in a therapeutic setting.

- 2 -

Following the December 16, 2015 hearing, the trial court entered a permanency review order memorializing its suspension of visitation. However, the court did not change the permanent placement plan of reunification. Additionally, the court directed that CUA refer Mother for a parenting capacity evaluation and that Mother continue with therapy. The court scheduled a permanency review hearing for March 2016.

The trial court also entered a separate aggravated circumstances order finding the existence of aggravated circumstances and directing the cessation of efforts "to preserve the family and reunify [Child and Mother]." In that order, the court directed that a hearing be held within thirty days.

A hearing was not held within thirty days of the trial court's aggravated circumstances order, and the matter proceeded to a permanency review hearing held on March 16, 2016, before a new presiding judge. During the witness's testimony, the court interceded and the following exchange occurred:

> **THE COURT**: So let me just say this. Given that on December 16, 2015[, the prior judge] made the finding, no efforts are to be made to preserve the family, reunify [Child] with [Mother] we don't have to go through objectives on [Mother] and where she is and everything like that because that's the court order. So there was no appeal taken of that December 16[th] order and therefore that stands. So I don't need any objectives put on the record as to [Mother] because the [c]ourt has already made a finding that there are to be no efforts to reunify.
>
> [**Mother's counsel**]: Your Honor, just one clarification note. Your Honor is in agreement that [M]other can still make her own efforts, isn't that correct?
>
> **THE COURT**: I don't know what that looks like because right now she doesn't have visits because they've been suspended at the recommendation of the

therapist. And [the CUA case manager] just testified that that is still the recommendation of the therapist, no contact, no visits.

[**Mother's counsel**]: But, Your Honor, there's much more thorough recommendations in the report, that I think you were just handed, from [the Children's Crisis Treatment Center ("CCTC")].

**THE COURT**: Okay.

[**Mother's counsel**]: You know, in terms of reasonable efforts even if the department has no affirmative obligation the parent's rights are not terminated yet and she has the right to make her own efforts.

**THE COURT**: Well considering that the order was made that there are no efforts to be made as to reunification, reunification is no longer the permanency goal. The permanency goal for [Child] now goes to either adoption or [permanent legal custody ("PLC")].

[**Mother's counsel**]: Your Honor, that goal was not changed and we didn't have a goal change hearing for that.

**THE COURT**: Well I'm changing the goal because essentially it was already done at the last court date. If [Mother] doesn't have to work on objectives and the [c]ourt has already said very clearly on December 16th that no efforts are to be made to preserve the family and reunify [Child] with [Mother], then essentially there is no reunification goal. The goal is adoption or PLC, whichever is appropriate in this case. And it really would be adoption because of the age of the child. So with that in mind—that decision was made before I got here.

[**Mother's counsel**]: So you['re] ordering that the goal is changed to adoption today?

**THE COURT**: The goal has—even though [the prior

- 4 -

judge] did not make the goal change. Given his order, reunification is not a viable option. So therefore today I'm making the order that the goal is now adoption for [Child] based on his previous ruling. He took testimony. He made that decision and so therefore, based on that, we don't have to get into objectives or anything like that. The goal is adoption.

[**Mother's counsel**]: Your Honor, please note my objection.

Following the March 16, 2016 hearing, the trial court entered [a] permanency review order. The order indicated that the permanent placement goal was "return to parent or guardian" and added a concurrent placement plan of adoption. The court further directed:

THE DHS GOAL IS CHANGED TO ADOPTION. THE CURRENT COURT GOAL IS REUNIFICATION UNTIL PETITIONS ARE FILED. A meeting among the parties is to occur within 30 days to discuss the appropriate goal. Reunification has been ruled [out] as to [Mother] as a viable goal.

Mother timely appealed from the March 16, 2016 order….

*In Interest of Z.V.*, 158 A.3d 665, 666-68 (Pa.Super. 2018) (internal footnotes and citations to record omitted).

While Mother's appeal from the March 16, 2016 order was pending, on June 16, 2016, DHS filed a petition to terminate Mother's parental rights to Child at Docket No. AP-0000552-2016, and a petition to change Child's permanency goal to adoption at Docket No. DP-0001269-2015. Additionally, on October 18, 2016, the court entered against Mother a stay-away order prohibiting Mother from contacting Child's foster mother, Mother's aunt, based upon reports Mother had repeatedly harassed Child's foster mother over the

phone.

On January 4, 2017, the trial court conducted a hearing on DHS' termination and goal change petitions, during which the court heard testimony from Child's CCTC therapist, Child's CUA case manager, Mother, and Child's foster mother.

Child's therapist, on behalf of DHS, testified and explained she had been Child's trauma focus therapist since July 2015, after a social worker referred Child to therapy in light of reports Mother had physically abused Child. In September 2015, Child disclosed to her foster mother and a caseworker that her older brother sexually assaulted her numerous times when both children were in Mother's care. Also in September 2015, Child's therapist recommended suspension of Mother's supervised visits with Child because: Mother had encouraged Child to make false allegations of mistreatment by foster mother and told Child not to follow her foster mother's directions; Child feared Mother would hit her if she did not follow Mother's instructions; and Child exhibited increased behavioral problems following Mother's visits. In meetings with the case manager, Mother failed to acknowledge she caused Child trauma, disbelieved Child had been sexually abused, and described Child as a liar and a manipulator. Since February 2016, Mother failed to attend any caregiver sessions with Child's therapist and had attended less than three throughout Child's treatment. When Child's therapist began counseling with Child, Child exhibited several trauma symptoms, including, *inter alia*: trouble

sleeping, nightmares, nighttime enuresis, dishonesty, physical aggression, inability to focus, and suicidal ideation. Child's therapist diagnosed Child with post-traumatic stress disorder ("PTSD") and attention-deficit/hyperactivity disorder ("ADHD"). As of January 2017, Child had progressed with therapy and the severity of her symptoms had diminished, but Child's therapist maintained the recommendation that Mother should not visit with Child. Child's therapist explained Child needs a stable and consistent caregiver, which role the therapist opined Mother was unable to fulfill. Child's therapist also indicated Child has a good relationship with her foster mother; foster mother supports Child's recovery and Child loves foster mother. (*See* N.T. Termination/Goal Change Hearing, 1/4/17, at 20-37).

A CUA case manager, who became involved with Child's case in July 2016, also testified on behalf of DHS. The CUA case manager reiterated that during visitation, Mother coached Child to make false allegations against Child's foster mother, and Child's behavior deteriorated after Mother's visits. CUA developed for Mother single case plan ("SCP") objectives, which included, *inter alia*: undergoing anger management counseling; completing part two of a parenting capacity evaluation; and participating in mental health treatment, including complying with a mental health medication management program. Mother failed to provide CUA with documentation of her anger management treatment and mental health treatment. Mental health treatment reports CUA obtained from Mother's provider indicated Mother had attended one treatment

session each in June and October 2016, but she had not attended sessions between June and October 2016, or after October 2016. While Child was in foster mother's care, Mother had made threatening phone calls and sent threatening text messages to foster mother. Additionally, at a meeting about Child's placement, Mother commented she wanted to punch the case manager's supervisor. The CUA case manager had observed Child with her foster mother, to whom Child had bonded. Child and her foster mother have a good, caring relationship, and Child looks to her foster mother for daily support, parental guidance, and love. The CUA case manager opined termination of Mother's parental rights to Child is in Child's best interest, because: Mother failed to complete her SCP objectives; Child is fearful of Mother; and Child has improved overall since she has been in the care of foster mother. The case manager added she believed Child would not suffer irreparable harm if Mother's parental rights to Child were terminated. (*Id.* at 48-65).

Additionally, Mother testified on her own behalf. Mother explained she had last received mental health treatment from her original provider in October 2016, when the counseling center had dismissed her from treatment because it lacked resources. Mother added she had missed several therapy appointments due to other medical issues and because her therapist had repeatedly cancelled sessions. Mother claimed she had received mental health treatment from two different therapists since October 2016. Mother said her

original counseling center reinstated her treatment earlier on the day of the termination hearing, and she attended a counseling session that same day. Mother conceded she used corporal punishment to discipline Child, which included hitting Child with a belt. Mother stated she originally sought social services assistance to learn to better parent Child and discipline Child without beating her. Mother also acknowledged two of her other children have been in the care of Child's foster mother. (***Id.*** at 83-107).

Child's foster mother, who is Child's maternal great-aunt, also testified. Foster mother has known Child since she was born, and at the time of the January 4th hearing, Child had been in foster mother's care for nearly two years. Foster mother also had in her care two of Child's older siblings. While Child was in foster mother's care, Mother had repeatedly threatened and harassed foster mother over the phone. In one instance, Mother sent foster mother approximately forty-one text messages at 2:00 a.m. accusing foster mother and others of abusing Child. Foster mother and Mother had a good relationship in the past; their relationship deteriorated only after foster mother began to care for Child. On the day of the January 4th hearing, Mother and foster mother communicated, and foster mother indicated she had a "breakthrough" with Mother during their discussion. Foster mother requested the court to lift the stay-away order against Mother to allow foster mother and Mother attempt to reestablish a relationship in the interest of promoting a healthy relationship between Child and Mother. (***Id.*** at 114-123). On January

4, 2017, the court entered a decree terminating Mother's parental rights to Child and an order changing Child's permanency goal to adoption. That same day, the court lifted the stay-away order against Mother.

With respect to Mother's pending appeal, on January 24, 2017, in an unpublished memorandum (republished on March 23, 2017), this Court vacated the trial court's March 16, 2016 goal change order and remanded for a permanency review hearing. *See In Interest of Z.V., supra*.

Meanwhile, Mother filed a timely notice of appeal from the trial court's January 4, 2017 termination decree on February 3, 2017, which was docketed at No. 522 EDA 2017. On February 23, 2017, Mother filed in this Court an "Application for Remand," requesting this Court to vacate the trial court's January 4, 2017 decree and remand for a permanency review hearing consistent with this Court's January 24, 2017 appellate directive. On March 31, 2017, this Court entered the following order in response to Mother's request for a remand:

> The above-captioned appeal is hereby REMANDED to the Philadelphia County Court of Common Pleas, and the common pleas court is **permitted** to vacate its January 4, 2017 order in light of this Court's decision in Superior Court Docket No. 1211 EDA 2016.
>
> Jurisdiction is RELINQUISHED.

(Order, filed March 31, 2017) (emphasis added). In other words, this Court allowed the trial court to hold a permanency review hearing on remand as directed and gave the court the discretion to vacate the January 4, 2017

termination decree **if** the court determined the evidence so required. With this Order, the appeal at No. 522 EDA 2017 ended.

On remand, the trial court conducted the permanency review hearing, as directed, on October 4, 2017. Before the court heard testimony, Mother made an oral motion for recusal, which the court denied. During the hearing, the court limited the parties to presenting only that evidence which they could have offered at the initial permanency review hearing on March 16, 2016. The court heard the testimony of a CUA caseworker, on behalf of DHS, and Mother.

At the remand hearing, the CUA caseworker testified she had been involved with Child's case since May 2015. A letter from Child's trauma therapist dated March 15, 2016, in CUA's records indicated the therapist had recommended continued suspension of Mother's visits with Child, because Mother had inappropriate contact with Child during the visits and Child's behavior worsened after visits. The March 15th letter also indicated Child's therapist would consider recommending Mother's visits with Child to resume, but only after Mother had made progress in her own therapy and acknowledged her role in causing Child's trauma. CUA had requested Mother to participate in caregiver sessions at CCTC, but nothing in CUA's records indicated Mother had attended any caregiver sessions. Further, as of March 2016, Mother had not completed her SCP objectives. (**See** N.T. Permanency Review Hearing, 10/4/17, at 5-12).

Mother also testified at the remand hearing. Mother stated she had

participated in anger management, mental health treatment, and parenting classes through March 2016. Specifically, Mother said that, by March 2016, she had received mental health treatment and anger management counseling for approximately a year. Mother testified she signed necessary releases on Child's behalf and attempted to communicate with Child's therapist. Mother added she had participated in caregiver sessions, but stopped when the therapist said she did not need to see Mother again. By March 2016, Mother claimed she had completed part one of the parenting capacity evaluation, but she had not completed part two. Mother said she acknowledged in therapy that she had lost her temper with Child, was wrong to do so, and wished to correct her behavior to reunite with Child. Mother provided to the court a medication management report, but Mother had no documentation of her ongoing participation in mental health treatment. (**Id.** at 14-42).

Following the permanency review hearing on remand, on October 4, 2017, the court entered identical orders at both docket numbers to let stand its prior January 4, 2017 termination decree and goal change order. On November 3, 2017, Mother timely filed at both docket numbers notices of appeal and contemporaneous statements of errors complained of on appeal per Pa.R.A.P. 1925(a)(2)(i).

Mother raises the following issues for our review:

> DID THE [TRIAL] COURT FAIL TO COMPLY WITH THE SUPERIOR COURT'S ORDER OF MARCH 31, 2017?
>
> DID THE [TRIAL] COURT FAIL TO COMPLY WITH THE

SUPERIOR COURT'S REMAND DECISION OF JANUARY 24, 2017 BY…CONDUCT[ING] ONLY A "SNAPSHOT" HEARING AND NOT A FULL PERMANENCY REVIEW HEARING UNDER THE [PENNSYLVANIA] JUVENILE ACT, 42 PA.C.S.A. § 6301, *ET SEQ*.?

DID THE [TRIAL] COURT['S] OCTOBER 4, 2017 ORDERS LETTING STAND ITS JANUARY 4, 2017 PRIOR ORDERS CHANGING…CHILD'S PERMANENCY GOAL TO ADOPTION AND TERMINATING [MOTHER]'S PARENTAL RIGHTS DENY MOTHER AND CHILD DUE PROCESS?

(Mother's Brief at 4-5).[1]

In her issues combined, Mother argues the trial court failed to comply with this Court's March 31, 2017 remand order, when the court chose not to vacate its January 4, 2017 termination decree before holding the permanency review hearing on remand. Mother insists the trial court incorrectly interpreted this Court's decision when it limited the parties at the remand hearing to presenting only the evidence they could have introduced at the

---

[1] Mother includes in her statement of questions presented numerous subheadings, which she failed to support with discussion in the argument section of her brief. For example, Mother's brief contains no argument on the following claims: (1) the trial court lacked jurisdiction to hold the October 4, 2017 hearing without first vacating its January 4, 2017 order terminating Mother's parental rights, because more than 30 days had elapsed since January 4, 2017 order; (2) the October 4, 2017 hearing did not constitute a permanency review hearing under 42 Pa.C.S.A. § 6351; and (3) the trial court determined Mother was merely a witness for purposes of the October 4, 2017 hearing, because the court had previously terminated Mother's parental rights to Child. Accordingly, we give these claims no consideration. ***See Butler v. Illes*** 747 A.2d 943 (Pa.Super. 2000) (providing where appellant fails to raise or develop her issues on appeal properly, or where her brief is wholly inadequate to present specific issues for review, this Court can decline to address appellant's claims on merits); Pa.R.A.P. 2119(a).

original March 16, 2016 permanency review hearing ("snapshot hearing"). Specifically, Mother avers the trial court barred Mother from presenting at the remand hearing more recent and contemporary information to refute termination of Mother's parental rights to Child. Mother also contends the court improperly admitted hearsay evidence that did not meet the business records exception to the hearsay rule.

Moreover, Mother complains the trial court abused its discretion when it denied Mother's recusal motion. Likewise, Mother asserts the evidence in this case was insufficient to support the court's decision to let stand its prior January 4, 2017 decree terminating Mother's parental rights to Child and its prior order changing Child's permanency goal to adoption. Mother concludes this Court should vacate the trial court's orders and remand for further proceedings. We disagree.

As a preliminary matter, to preserve a claim of error for appellate review, a party must make a specific objection to the alleged error before the trial court in a timely fashion and at the appropriate stage of the proceedings; failure to raise an objection results in waiver of the underlying issue on appeal. *In re J.A.*, 107 A.3d 799, 820 (Pa.Super. 2015). *See also Cominsky v. Donovan*, 846 A.2d 1256, 1262 (Pa.Super. 2004) (stating: "[T]o preserve an evidentiary objection, a party must make a timely and specific objection to the admission or the exclusion of the evidence"). "Issues not raised in the [trial] court are waived and cannot be raised for the first time on appeal."

Pa.R.A.P. 302(a).

Further, appellate briefs must conform in all material respects to the briefing requirements set forth in the Pennsylvania Rules of Appellate Procedure. Pa.R.A.P. 2101. **See also** Pa.R.A.P. 2114-2119 (addressing specific requirements of each subsection of brief on appeal). Regarding the argument section of an appellate brief, Rule 2119(a) provides:

> **Rule 2119. Argument**
>
> **(a) General rule.**—The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part—in distinctive type or in type distinctively displayed—the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.

Pa.R.A.P. 2119(a). Importantly, where an appellant fails to raise or develop her issues on appeal properly, or where her brief is wholly inadequate to present specific issues for review, this Court can decline to address the appellant's claims on the merits. **Butler, supra**. **See also Lackner v. Glosser**, 892 A.2d 21 (Pa.Super. 2006) (explaining arguments must adhere to rules of appellate procedure and arguments which are not appropriately developed are waived; arguments not appropriately developed include those where party has failed to cite authority to support contention); **Estate of Haiko v. McGinley**, 799 A.2d 155 (Pa.Super. 2002) (stating appellant must support each question raised by discussion and analysis of pertinent authority; absent reasoned discussion of relevant law in appellate brief, appellant hampers this Court's review and risks waiver).

Additionally, an appellant's failure to cite to the record and relevant supporting authority constitutes waiver:

> An appellate brief must provide citations to the record and to any relevant supporting authority. The court will not become the counsel for an appellant and will not, therefore, consider issues which are not fully developed in [her] brief. Failing to provide…citation to the record represents serious deviations from the briefing requirements of the Rules of Appellate Procedure. Because such an omission impedes on our ability to address the issue on appeal, an issue that is not properly briefed in this manner is considered waived.

***Commonwealth v. Gould***, 912 A.2d 869, 873 (Pa.Super. 2006) (internal citations and quotation marks omitted). ***See also*** Pa.R.A.P. 2119(c) (providing: "If reference is made to the pleadings, evidence, charge, opinion or order, or any other matter appearing in the record, the argument must set forth, in immediate connection therewith, or in a footnote thereto, a reference to the place in the record where the matter referred to appears…").

Instantly, Mother raises her hearsay claim for the first time on appeal. ***See Cominsky, supra***. Further, in her brief, Mother fails to identify the purportedly inadmissible hearsay the trial court allegedly admitted and does not cite to the record to support her assertion. ***See*** Pa.R.A.P. 2119(c). Therefore, Mother's hearsay challenge is waived. ***See Gould, supra***; Pa.R.A.P. 302(a). Additionally, Mother fails to cite to relevant authority to support her recusal claim; the sole case Mother relies upon does not discuss recusal. Instead, the case addresses the admission of prior convictions evidence in a criminal case. Thus, Mother's recusal claim is also waived. ***See***

*Lackner, supra*; *Gould, supra*.

Regarding Mother's remaining complaints, ordinarily, "where a case is remanded to resolve a limited issue, only matters related to the issue on remand may be appealed." *Commonwealth v. Lawson*, 789 A.2d 252, 253 (Pa.Super. 2001). Nevertheless, there are instances where an appellate court can address claims unrelated to the issue on remand. *See Commonwealth v. Chamberlain*, 612 Pa. 107, 30 A.3d 381 (2011), *certiorari denied*, 566 U.S. 986, 132 S.Ct. 2377, 182 L.Ed.2d 1017 (2012) (explaining Supreme Court remanded case to trial court, recognizing that remand proceedings could provide basis for appellant to seek relief; following remand, Supreme Court considered additional claims from appellant). In light of the importance of the rights involved, the complex procedural history of this case, and in all fairness to Mother, we will address her complaints raised on appeal with respect to the goal change and termination of her parental rights.

On appeal, goal change decisions are subject to an abuse of discretion standard of review. *In re N.C.,* 909 A.2d 818, 822 (Pa.Super. 2006).

> In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was "manifestly unreasonable," that the court did not apply the law, or that the court's action was "a result of partiality, prejudice, bias or ill will," as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence.

When the trial court's findings are supported by competent evidence of record, we will affirm, "even if the record could also support an opposite result."

*Id.* at 822-23 (internal citations omitted).

The Juvenile Act controls the disposition of dependent children. ***In re R.P.***, 957 A.2d 1205, 1217 (Pa.Super. 2008). Section 6351 provides in relevant part:

**§ 6351. Disposition of dependent child**

\* \* \*

**(f) Matters to be determined at permanency hearing.**—At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

\* \* \*

(9)   If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i)  the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

\*   \*   \*

**(f.1) Additional determination.**—Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1)   If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2)   If and when the child will be placed for adoption, and the county agency will file for

termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(3)     If and when the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(4)     If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

*     *     *

**(f.2) Evidence.**—Evidence of conduct by the parent that places the health, safety or welfare of the child at risk, including evidence of the use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk, shall be presented to the court by the county agency or any other party at any disposition or permanency hearing whether or not the conduct was the basis for the determination of dependency.

**(g) Court order.**—On the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f), (f.1), (f.2), (g).

"When the child welfare agency has made reasonable efforts to return a [dependent] child to [the child's] biological parent, but those efforts have

failed, then the agency must redirect its efforts towards placing the child in an adoptive home." *In re N.C., supra* at 823 (citing *In re G.P.-R.*, 851 A.2d 967, 973 (Pa.Super. 2004)).

> Although the agency has the burden to show a goal change would serve the child's best interests, "[s]afety, permanency, and well-being of the child must take precedence over **all** other considerations" under Section 6351. *In re D.P.*, 972 A.2d 1221, 1227 (Pa.Super. 2009), *appeal denied*, 601 Pa. 702, 973 A.2d 1007 (2009) (emphasis in original); *In re S.B.*, 943 A.2d 973, 978 (Pa.Super. 2008), *appeal denied*, 598 Pa. 782, 959 A.2d 320 (2008). "[T]he parent's rights are secondary" in a goal change proceeding. *In re D.P., supra*.
>
> Because the focus is on the child's best interests, a goal change to adoption might be appropriate, even when a parent substantially complies with a reunification plan. *In re N.C., supra* at 826-27. Where a parent's "skills, including her judgment with regard to the emotional well-being of her children, remain problematic[,]" a goal change to adoption might be appropriate, regardless of the parent's compliance with a permanency plan. *Id.* at 825. The agency is not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided. *In re A.L.D.*, 797 A.2d 326, 340 (Pa.Super. 2002). *See also In re S.B., supra* at 981 (giving priority to child's safety and stability, despite parent's substantial compliance with permanency plan); *In re A.P.*, 728 A.2d 375, 379 (Pa.Super. 1999), *appeal denied*, 560 Pa. 693, 743 A.2d 912 (1999) (holding where, despite willingness, parent cannot meet "irreducible minimum parental responsibilities, the needs of the child must prevail over the rights of the parent"). Thus, even where the parent makes earnest efforts, the "court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006).

*In re R.M.G.*, 997 A.2d 339, 347 (Pa.Super. 2010), *appeal denied*, 608 Pa. 648, 12 A.3d 372 (2010) (some internal citations and quotation marks

omitted) (emphasis in original).

Appellate review of termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).
>
> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.
>
> *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201

(Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191-92 (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

DHS filed a petition for the involuntary termination of Mother's parental rights to Child on the following grounds:

**§ 2511. Grounds for involuntary termination**

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable

- 23 -

period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P., supra* at 1117.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only

- 24 -

if the court determines that the parent's conduct warrants termination of…her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

Termination under Section 2511(a)(1) involves the following:

To satisfy the requirements of [S]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,

Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for…her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted). Regarding the six-month period prior to filing the termination petition:

[T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations

- 25 -

> offered by the parent facing termination of…her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.*, 797 A.2d 326 (Pa.Super. 2002). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Id.* at 340. The fundamental test in termination of parental rights under Section 2511(a)(2) was long ago stated in the case of *In re Geiger*, 459 Pa. 636, 331 A.2d 172 (1975), where the Pennsylvania Supreme Court announced that under what is now Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super. 1998).

"Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to

- 26 -

exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Z.P., supra* at 1118.

"[T]o terminate parental rights pursuant to [Section] 2511(a)(8), the following factors must be demonstrated: (1) [t]he child has been removed from parental care for [twelve] months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa.Super. 2003).

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and have…her rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super. 2001).  This Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child.  A child needs love, protection, guidance, and support.  These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child.  Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of…her ability, even in difficult circumstances.  A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship.  Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re B.,N.M., supra* at 855 (internal citations omitted).  "[A] parent's basic

constitutional right to the custody and rearing of…her child is converted, upon the failure to fulfill…her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *Id.* at 856.

Notably, neither Section 2511(a) nor Section 2511(b) requires a court to consider at the termination stage, whether an agency provided a parent with reasonable efforts aimed at reunifying the parent with her children prior to the agency petitioning for termination of parental rights. *In re D.C.D.*, 629 Pa. 325, 342, 105 A.3d 662, 672 (2014). An agency's failure to provide reasonable efforts to a parent does not prohibit the court from granting a petition to terminate parental rights under Section 2511. *Id.* at 346, 105 A.3d at 675.

Instantly, the plain language of this Court's March 31, 2017 order belies Mother's claim that the trial court erred when it declined to vacate the court's prior January 4, 2017 termination decree before conducting the October 4, 2017 remand hearing. This Court's order provided the trial court with the discretion to vacate its prior orders but did not direct the trial court to do so. The procedural posture of this case at the time of this Court's March 31, 2017 order was an appeal from the goal change/termination order/decree of January 4, 2017. With its March 31, 2017 order, this Court intended to abstain from ruling on that appeal until after the trial court had conducted the permanency review hearing previously ordered on remand and to give the trial

court the option at that time to vacate its January 4, 2017 termination decree if the court found the evidence warranted vacation. Therefore, the trial court had the opportunity to rule again on termination. Upon remand, the trial court simply declined to vacate its prior termination decree. *See In re Z.P., supra*; *In re N.C., supra*. Thus, Mother's claim of error in this regard fails.

Additionally, Mother's assertion the trial court improperly limited the parties, at the October 4, 2017 permanency review hearing on remand, to presenting only evidence the parties could have introduced at the original permanency review hearing on March 16, 2016, also fails. The court's decision to restrict the evidence at the remand hearing put the parties in the same respective positions they had occupied at the time of the original permanency review hearing. Thus, the trial court did not err when it limited the parties' evidence at the October 4, 2017 permanency review hearing. *See In re Z.P., supra*; *In re N.C., supra*. Therefore, Mother's "snapshot" evidentiary claim fails.

With respect to Mother's termination of parental rights and goal change claims, at the conclusion of the January 4, 2017 hearing, the court addressed its decision to terminate Mother's parental rights to Child and let stand its previous goal change order, in part, as follows:

> [W]e sit here at nineteen months and we have [a child] who is fortunate to have landed in a place with someone familiar because she's there with [foster mother]. And then I come to find out that [Child] has two older siblings and it sounds like maybe one of the older siblings has a child now. And so [foster mother] is taking care of a one-year-old.

But really today needs to be about [Child] and really what's in [Child]'s best interests. It's an unfortunate chain of circumstances that have led us to this point. I don't think that anybody disputes that [Mother] initially sought help…. And that is commendable and indeed a strength.

However, during that time there was an incident that rose to a level that that worker or workers had to report that incident. That's their responsibility as mandated reporters. And even with that report that did not have to be the end of it because once this matter was brought to court [Mother] had every opportunity to cooperate and comply with those [SCP] objectives. But one of the recurring themes that I have heard and even today when [Mother] provided testimony is that I really don't think that [Mother] has complete insight in the gravity of her actions when it comes to a life of a child….

To talk about how [Mother] exhorted discipline, to have a child cry after being physically spanked, to be hit with a belt for a minute, as an adult that would be offensive. But when you think of a [child] being exacted that type of punishment. The way it resonates in a [child] is much different from an adult. And what's clear is [Child] still lives in the shadows of what she's seen or what she experienced in terms of abuse.

Now we talked a lot about physical abuse, but the testimony is does she suffer from medical neglect? Does she suffer from sexual abuse of various persons? And at the end of the day today [this] has to be about [Child].

What I have heard in terms of [Mother] gives me concern and I don't think that [Mother] has done what she needed to do to ensure the return of her child. And what we see is a recurring theme of [Mother] threatening people through text messages, through comments, …those inappropriate actions keep on surfacing.

So [Mother] is not where she needs to be to deal with [Child] who has a traumatic history. Who has special needs that have to be dealt with. And I think that was clear through [Child's trauma therapist]'s testimony.

> I find the testimony of the therapist…, [the CUA case manager] who['s] here today as a social worker, and [foster mother] extremely credible. And I kind of feel that [Mother] lacks insight as to her actions that happen[ed] then and even as today through her testimony.
>
> So with that in mind, with clear and convincing evidence this [c]ourt will involuntarily terminate the rights of [Mother] as to [Child].
>
> The [c]ourt is making this ruling based on [23 Pa.C.S.A. §§] 2511[(a)(1), (a)(2), (a)(5), (a)(8),] and 2511[(b)], considerations have been taken in. I do believe that [DHS] has met their burden of proof.
>
> I believe that it is absolutely in the best interest of [Child] at this time for [Mother]'s parental rights to be terminated. I believe that [Child] will not suffer any irreparable harm because she has looked to [foster mother] to meet her day to day needs for over a year and a half. I believe that the fact that there were aggravated circumstances in this case found by [a previous judge] and the fact…that he made the order that reasonable efforts do not have to be made to reunify [Mother]. … When I assumed the case that is the disposition that was before the [c]ourt. And the [c]ourt believes that that was appropriate in light of the totality of the information taken in today.
>
> I do believe that at this time that this matter should be transferred to [the] Adoption Unit for further handling.

(N.T. Termination/Goal Change Hearing, 1/4/17, at 136-139). Additionally, the court provided the following rationale, in relevant part, at the conclusion of the October 4, 2017 remand hearing:

> … The [SCP] objectives as I understand them [as of March 2016] w[ere] mental health anger management, med[ication] management, [Mother]'s cooperation with CUA and the parenting capacity evaluation and supervised visits at that time had been suspended.

- 32 -

In terms of [M]other's level of compliance, in terms of mental health, even given the opportunity, [M]other has not provided treatment plans or progress reports that would have been a part of the permanency testimony [as of March 2016]. I do have this note of [February 24], 2017, and it's very general saying that she was attending treatment, [M]other, since [August 7], 2015. It does not indicate how frequently she was to attend treatment, it does not say how consistent she was with her treatment. It doesn't say what they were addressing in the context of her treatment, it's essentially not a treatment plan.

There is no indication that they were specially working on anger management and to that extent I agree with [the child advocate], given the circumstances that brought this case into care where you have a mother that is setting forth by her own admission, spanking, beating a child, I think that anger management would have definitely be[en] one of the primary concerns. I have no indication that [Mother] was actively engaged in anger management services [as of March 16,] 2016. So, at this point in time, [M]other's level was I would say at best minimally compliant.

Finally, there's the issue of the CCTC treatment record or the letter dated [March 15], 2016.

[The March 15th letter] clearly says at the end that CCTC is recommending that visits between [Child] and [Mother] continue to be suspended until [Mother] makes progress in her own therapy, and until [Mother] is able to acknowledge her role in [Child]'s trauma history, we're sitting here today, that still hasn't been established.

* * *

On [March 16, 2016], we have no documentation to say that [Mother] was actively engaged in treatment that could be submitted to [Child's trauma therapist] for reconsideration. We don't have—actually I have in this [March 15, 2016] report, quite the contrary that [Mother] is indicating she believes that [Child] is coached by [her foster mother], that she believes that [Child] is a liar and a manipulator and [Mother] takes very little ownership of anything that she may have done that contributed to this matter coming forth.

- 33 -

> So I do not believe [as of March 16, 2016,] that [Mother] had successfully or substantially addressed her goals so that we can even consider reunification at that time. …
>
> … [A]nd I submit to the parties here that based on the evidence that was provided at the time of the involuntary termination of parental rights [hearing] for [Child], that the [c]ourt did not err in its ruling. That [M]other has not been compliant, and that therefore the order will stand as to the [in]voluntary termination. …

(N.T. Permanency Review Hearing, 10/4/17, at 54-57). The record in this case tells a tragic story of continued neglect, abuse, and corruption of a small child while in the care of a parent found to be a grave threat to the child. The evidence showed that Mother's continued presence in Child's life is both harmful and hostile to Child's welfare. Child fears Mother and looks to foster mother for daily support, parental guidance, and love. Thus, the record supports the court's orders confirming its prior decree terminating Mother's parental rights to Child and the prior order changing Child's permanency goal to adoption. *See In re Z.P., supra*; *In re N.C., supra*. Accordingly, we affirm.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/18/18

- 34 -