J-S45016-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1166 MDA 2025 |

Appeal from the Order Entered August 12, 2025
In the Court of Common Pleas of Berks County Juvenile Division at
No(s):  CP-06-DP-0000152-2025

| | | |
|---|---|---|
| IN THE INTEREST OF: M.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1167 MDA 2025 |

Appeal from the Order Entered August 12, 2025
In the Court of Common Pleas of Berks County Juvenile Division at
No(s):  CP-06-DP-0000149-2025

| | | |
|---|---|---|
| IN THE INTEREST OF: I.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1168 MDA 2025 |

Appeal from the Order Entered August 12, 2025
In the Court of Common Pleas of Berks County Juvenile Division at
No(s):  CP-06-DP-0000150-2025

J-S45016-25

BEFORE: STABILE, J., MURRAY, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY MURRAY, J.:       **FILED: JANUARY 28, 2026**

J.M. (Mother), the biological mother of M.M., I.K., and S.M. (daughters born in January 2010, May 2011, and June 2017, respectively) (collectively, Children), appeals the orders granting the petitions filed by Berks County Children and Youth Services (BCCYS), which adjudicated Children dependent, removed Children from Mother's home, and placed Children in the custody of BCCYS.[1] After careful review, we affirm.

The family initially came to BCCYS's attention in April 2025, after it received a report that Children were homeless and truant. N.T., 8/6/25, at 5. On July 25 and 28, 2025, BCCYS filed substantially similar petitions for emergency custody of Children, alleging concerns regarding Children's safety, and access to food and housing. The juvenile court[2] issued emergency protective orders (EPOs), but later vacated both EPOs after BCCYS was unable to locate Children. On August 1, 2025, upon learning that Mother and Children

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The whereabouts of M.R. (the biological father of S.M.) and C.T. (the biological father of M.M.) were unknown prior to, and at the time of, the dependency hearing. N.T. (Dependency Hearing), 8/6/25, at 3. I.K.'s biological father, J.K., is deceased. *Id.* Mother is also the biological mother of minor daughter F.A.-M. (who, during most periods of BCCYS's investigation in this case, resided with her biological father), and adult son S.J. Juvenile Court Opinion, 9/18/25, at 2. M.R., C.T., F.A.-M., and S.J. are not involved in the instant appeal.

[2] The Honorable Tina M. Boyd presided over all relevant proceedings.

- 2 -

were camping on the property of a family friend, BCCYS filed a third petition for protective custody, which the juvenile court granted. BCCYS took Children into its custody, and the juvenile court scheduled a shelter care hearing, which occurred on August 4, 2025. On August 7, 2025, the juvenile court adopted the juvenile hearing officer's recommendation, and ordered that Children remain in shelter care.

In the interim, on August 4, 2025, BCCYS filed identical dependency petitions as to each child. BCCYS alleged "concerns regarding unstable housing and income, [and Mother's] lack of appropriate parenting skills, unstable mental health, substance abuse, [and] domestic violence concerns between Mother" and Mother's paramour, James Henry (Mr. Henry). Dependency Petitions, 8/4/25, ¶ 69.

The matter proceeded to a dependency hearing on August 6, 2025. Mother appeared, represented by court-appointed counsel. Children also appeared, represented by a guardian *ad litem* (GAL). BCCYS called as witnesses BCCYS caseworkers Noelle Cox (Ms. Cox) and Samantha Strobel (Ms. Strobel). Mother testified on her own behalf.

Ms. Cox testified that, as of April 2025, Mother, Mr. Henry, and Children (the family) were living in a one-room residence at the Cab Motel in Palm, Pennsylvania (Cab Motel residence). N.T., 8/6/25, at 5. Ms. Cox explained that on July 7, 2025, BCCYS received a report that Mother had suffered a medical event requiring her transport to the hospital via ambulance. *Id.* at

6; *see also id.* (Ms. Cox testifying that "it was unclear if it was a medical emergency or possibly some type of mental health cris[i]s for [M]other."). In attempting to conduct a safety assessment of Children, upon Mother and Children's return from the hospital, BCCYS received little cooperation from Mother or Mr. Henry. *Id.* at 5-6; *see also id.* at 6 (Ms. Cox testifying that responding caseworkers had to call for police assistance due to Mr. Henry's aggressive behavior).

Ms. Cox explained that she visited the family the following day, and observed the Cab Motel residence was in disarray, had no electricity, and contained "very little food[.]" *Id.* at 7. Ms. Cox testified that she asked Mother to arrange for Children to remain where they currently were, *i.e.*, at Mother's friend's residence, as the weather was hot, and the Cab Motel residence had "no air conditioning, no fans, nothing." *Id.* at 8; *see also id.* at 9 (Ms. Cox testifying that she and Mother could only remain in the Cab Motel residence for less than ten minutes before they "were dripping in sweat and had to step out of the room because it was so hard to breathe …."). Ms. Cox testified that Mother indicated she was in the process of being evicted from the Cab Motel residence. *Id.* at 9. According to Ms. Cox, when asked about securing appropriate housing, Mother "didn't really have a plan at that time[,]" but stated that she and Children "might be able to stay with friends" or family. *Id.* at 10.

Ms. Cox next visited the family on July 25, 2025. *Id.* at 15. Ms. Cox testified that "[t]here was still no electricity in the [Cab Motel residence]. There was no food. There [were] only condiments." *Id.* Ms. Cox testified that she observed damage to the windows of Mother's and Mr. Henry's vehicles. *Id.* at 16; *see also id.* at 20 (Ms. Cox testifying that Children advised her that Mother and Mr. Henry had "smashed [] out [the car windows] during arguments."). Ms. Cox explained that Mother still did not have a plan for securing appropriate housing, "[b]ut [M]other said that [the family] could just camp around for the rest of the summer and that would be fine[.]" *Id.*

According to Ms. Cox, Children advised her that Mother and Mr. Henry's fighting was "stressful" to Children; Mr. Henry had threatened to "punch" Children; and Mr. Henry had "threatened to stab [I.K.'s] neck[.]" *Id.* at 20-21. Mr. Cox explained that Children further advised her that, as of 3:00 p.m. that day, Children had not eaten and were hungry. *Id.* at 21; *see also id.* (Ms. Cox testifying that I.K. asked her for ten dollars to purchase food), 20-21 (Ms. Cox testifying that M.M. told her, "[W]e only have ketchup packets, relish[,] and mustard in the room. And [I.K.] shrugged her shoulders and … said, well, I ate the ketchup packets already. And [M.M.] said, really, you ate those?").

Ms. Cox stated that, based upon her observations and what she learned from Children, she requested authorization from her supervisor to take Children into BCCYS's custody. *Id.* at 22. Ms. Cox testified that she obtained

that authorization and contacted law enforcement for assistance. *Id.* at 23. Ms. Cox explained, however, that by the time law enforcement arrived, Mr. Henry had removed Children from the Cab Motel residence, and Mother "would not share where [C]hildren were." *Id.* at 23-24.

Ms. Cox testified that Children were ultimately located and taken to Bethany Children's Home on August 1, 2025. *Id.* at 25. Ms. Cox testified that Children advised her that, since July 25, 2025, "things had gotten so bad … while they were camping that [Children] had started to talk … about wanting to run away" to "find [their] way to" Ms. Cox. *Id.* Ms. Cox explained that Children told her they "were just very excited about the idea of having their own beds to be able to sleep in[,]" and that "they just wanted to talk to [Ms. Cox] about how safe they felt being somewhere they could have food." *Id.* at 26.

Ms. Strobel testified that on August 1, 2025, with law enforcement assistance, she traveled to the residence of one of Mother's friends, Lynn Ketenberg (Ms. Ketenberg),[3] to take Children into BCCYS's custody. *Id.* at 40. Ms. Strobel testified that, while speaking with Mother, Mother

> left mid-conversation to go into [the] tent that [the family was] sleeping in, and that's when I observed [M]other leaving the back of the tent with [C]hildren following her. At that point[,] one of the officers went in through the tent and … [Children] exited the tent one[-]by[-]one.

---

[3] It is unclear from the record whether Ms. Ketenberg is Mother's friend referenced above.

*Id.* at 40-41.

Ms. Strobel testified concerning her subsequent conversation with, and observation of, Children:

> [I.K.] had told me [Children] had showered two days ago. That was the only time that week they had showered. [Children] told me that they were using the bathroom outside. [Children] were wet from sleeping in the rain. [Children] were washing their clothes in a bucket of water. And it was very apparent that [Children] had not showered within at least a couple of days. [Children] were covered in mud. [Children's] belongings were covered in mud. [There was a v]ery fo[u]l odor coming from [Children].

*Id.* at 41.

Ms. Strobel further testified regarding Children's living conditions:

> [I]t was a blue tent, and then behind the blue tent it was like a camo[uflage] umbrella. Although I didn't see the inside of the tent, [Children] did tell me there were no pillows or blankets for them to sleep. [Children] were just sleeping on the bottom of the tent. There were dishes outside. [The family's] one vehicle[,] with the windows and stuff broken out[,] was sitting on site. There was a case of water. I did not observe any clothing or anything for [Children].

*Id.* at 42; *see also id.* at 47 (Ms. Strobel testifying that she did not observe food at the campsite, and that Children advised her that they were hungry).

Mother testified that the family had been residing at the Cab Motel residence for the past "couple of years. But [Children] and I went to visit

family a lot[,] too[,] and friends[.]"[4]  *Id.* at 49; *see also id.* at 53 (Mother testifying that, when they were not staying at the Cab Motel residence, she "had a couple friends that let us stay over, so [Children] and I would sleep at a couple friends' houses."). When staying at the Cab Motel residence, Children and F.A.-M.[5] would sleep "on one big mattress …, but we also had dividers at one point. … We would put dividers down and then sheets so [Children] had a place to themselves." *Id.*

Mother testified that she had previously been working at a convenience store, and that she had been homeschooling Children, but she and Children "took a break [from work and school] … to kind of be together as a family." *Id.* at 50. Mother explained that she also "sold stuff online. And [Children] and I[] have a little [] boutique [] at the consignment shop up the street[,]" where Mother sells "stuff that we don't use anymore[,] or [Children] would make bracelets[ to sell]." *Id.*

Mother testified that, after vacating the Cab Motel residence, she and Children began camping on Ms. Ketenberg's property. *Id.* at 53. Mother

_____

[4] The record does not disclose whether Mr. Henry was continuously residing with Mother and Children when Mother and Children stayed somewhere other than the Cab Motel.

[5] F.A.-M. was visiting her biological father in New Jersey during the majority of BCCYS's involvement with the family. N.T., 8/6/25, at 15. While there is a custody order involving F.A.-M., *id.* at 34, its terms are not apparent from the record. At the time of the dependency hearing, F.A.-M. resided with her biological father. *Id.* at 52.

testified that Ms. Ketenberg had on her property a private residence and separate fitness center. *Id.* at 55. Mother explained that Ms. Ketenberg permitted Children to use the fitness center's shower when it was not being used by customers of the center. *Id.* Mother testified that "[i]f [Children] had to [defecate] …, if it was an emergency[,]" Children could use the fitness center's toilet. *Id.* Mother suggested Children were accustomed to these living conditions, as "we are an off-grid, … bushcrafting family, so [Mother] always taught [Children] how to survive and be self-sufficient off the land." *Id.* at 55-56.

Mother admitted that, at the time of the dependency hearing, Children had not seen their family physician or dentist for two years. *Id.* at 64. According to Mother, she was aware Children "are due for a checkup[,]" and "was in the process of working on getting one for them." *Id.*

Concerning her plan for obtaining adequate housing, Mother testified that, while she had not signed a lease, she was "in the process of cleaning [] out" a large apartment for the family. *Id.* at 57. Mother testified that she was nearly finished making the apartment habitable, but that, in the interim, "I have family and I have my mother [(maternal grandmother)] who would take [Children] and keep them until I have [the apartment] finished." *Id.* at 58; *see also id.* at 27 (Ms. Cox testifying that maternal grandmother contacted Ms. Cox one day prior to the dependency hearing, and indicated she desired to be a resource for Children). *But see id.* at 34-35 (Ms. Cox

testifying that maternal grandmother "stated she hasn't seen [C]hildren in between two and three years," and "admitted that she doesn't really know [C]hildren.").

At the conclusion of the hearing, the juvenile court adjudicated Children dependent, and ordered that Children remain in BCCYS's care pending permanency review. Mother filed timely notices of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) concise statements.[6] On September 18, 2025, the juvenile court filed a Rule 1925(a) opinion.

Mother raises the following issues:

> 1. Did the [Juvenile] Court err in finding that [Children were] "dependent []" pursuant to 42 Pa.C.S.A. §[ ]6302?
>
> 2. Did the [Juvenile] Court err in its decision to remove [Children] based on the weight of evidence presented at the adjudicatory hearing by [BCCYS]?

Mother's Brief at 12.

The standard of review in dependency cases

> requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*Interest of S.K.*, 331 A.3d 74, 80 (Pa. Super. 2025) (quoting *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010)). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility

---

[6] We *sua sponte* consolidated Mother's appeals on September 8, 2025.

determinations and resolve conflicts in the evidence." *Interest of A.J.*, 345 A.3d 374, 381 (Pa. Super. 2025) (citation omitted).

We have further recognized that, in dependency cases, "the utmost concern is for the children's welfare and therefore[,] nothing short of [a] comprehensive and searching inquiry[, by the juvenile court,] into the facts mandated by decisions of this [C]ourt will be acceptable." *Interest of K.B.*, 331 A.3d 50, 57 (Pa. Super. 2025) (citation omitted).

> In her first issue, Mother argues BCCYS
>
> failed to show[,] by clear and convincing evidence[,] there was unstable housing and income, lack of appropriate parenting skills, unstable mental health, substance abuse, domestic violence concerns, lack of appropriate medical care, [or] lack of appropriate schooling[,] based on Mother's explanation/response that she showed consistent effort in not only providing the necessities of life for [C]hildren, [but] provid[ing] them with education and a natural lifestyle of self-sufficiency and living off the land.

Mother's Brief at 43.

The Juvenile Act defines a "dependent child" as one who, *inter alia*, "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for [the child's] physical, mental, or emotional health, or morals." 42 Pa.C.S.A. § 6302. "[T]he definition of a dependent child is intended to be flexible and to encompass the myriad circumstances that may cause a child to be without proper parental care or control." *Interest of S.D.*, 334 A.3d 919, 927 (Pa. Super. 2025) (quotation marks and citation omitted). "These circumstances routinely include lack of appropriate housing, and unemployment." *K.B.*, 331 A.3d at 59 (citation,

- 11 -

quotation marks, and brackets omitted); *see also id.* (in a dependency case, concluding the trial court erred by, *inter alia*, excluding relevant evidence concerning the parent's employment status and "continuing housing instability"); *Interest of S.U.*, 204 A.3d 949, 963 (Pa. Super. 2019) (affirming the trial court's finding of dependency where, *inter alia*, the child "consistently attended school with an odor and unclean clothes"; the child "was sleeping on the floor, on a double mattress, which he shared with [his p]arents"; and the family's residence "was unclean and [the c]hild felt unsafe going outside.").

"This Court has held a child will be declared dependent when he is presently without proper parental care or control, and when such care and control are not immediately available." *K.B.*, 331 A.3d at 56 (citation omitted).

> Proper parental care has been defined as that care which (1) is geared to the particularized needs of the child[,] and (2) at a minimum, is likely to prevent serious injury to the child. The question of whether a child is lacking proper parental care and control encompasses two discrete questions: whether the child presently is without proper care and control, and if so, whether such care and control is immediately available. In answering the first question, the paramount concern[] is the welfare of the child at the time of the hearing. In answering [] the second question, it may be necessary for the hearing court to look to the future.

*Id.* (citations, brackets, and quotation marks omitted).

After conducting a hearing, the juvenile court may adjudicate a child dependent if the petitioner has presented clear and convincing evidence that the child meets the statutory definition. *Interest of J.R.*, 333 A.3d 446, 452

(Pa. Super. 2025) (*per curiam*); ***see also id.*** (stating that clear and convincing evidence "is defined as evidence that is so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." (citation omitted)).

> In making this determination, [] the court must consider not only what sort of parental care the child received in the past, but also what sort of parental care the child will receive if custody is given to the parents. Because a finding that a child is dependent is very serious and could potentially [a]ffect a child's future attitude toward and relationship with his parent, we have urged trial courts to make comprehensive inquiries before concluding that a child is without proper parental care or control.

***In re Swope***, 571 A.2d 470, 472 (Pa. Super. 1990) (quotation marks and citations omitted); ***see also In re N.A.***, 116 A.3d 1144, 1149 (Pa. Super. 2015) ("It is well settled that the proper inquiry in a dependency adjudication follows a bifurcated analysis: Is the child *at this moment* without proper parental care or control?; and if so, is such care or control *immediately* available?" (emphasis in original; quotation marks and citation omitted)).

Here, the juvenile court based its dependency findings on numerous factors, *i.e.*, (1) unsuitable housing; (2) Mother's failure to attend to Children's medical or educational needs; (3) Mother's failure to supply Children with adequate sustenance; and (4) concerns regarding Mother's mental health and domestic violence in the household.

In determining Children's unsuitable living conditions supported its finding of dependency, the juvenile court relied on **K.B.**, ***supra***. **See** Juvenile

Court Opinion, 9/18/25, at 10. In **K.B.**, we concluded the record failed to support the trial court's finding that the child could live, indefinitely, with his great-grandmother. **K.B.**, 331 A.3d at 61. We observed that the testimony "demonstrated great-grandmother lived in a senior facility, the management was permitting **mother** to stay there **temporarily**[,] but [mother] could be evicted at any time." **Id.** (capitalization modified; emphasis in original). Further, we deemed significant the fact that the Philadelphia Department of Human Services "had never inspected the residence for suitability and safety." **Id.** Finally, citing **Interest of A.J.F.**, 318 A.3d 1288 (Pa. Super 2024) (unpublished memorandum),[7] we noted "this Court has found casual arrangements where the parent does not have a lease to be unsuitable." **K.B.**, 331 A.3d at 61.

Here, the juvenile court observed that,

[l]ike in **K.B.**, [] the housing situation that befell [] Children under the care of [Mother] can most charitably be described as "unstable." For much of BCCYS'[s] involvement with [the] family, they resided at a motel. This, in and of itself[,] is not a problem, but several factors made this situation untenable. First, the condition of the motel room was unacceptable, with disorganized clutter strewn about, including an unsecured BB gun that[,] a BCCYS caseworker noticed[,] was laying on top of a dresser during one visit. Further, the family's motel room lacked electricity. In the summer, this meant a lack of air conditioning, which led to the family sleeping in a room that reached dangerous levels of heat. To remedy this, [Mother] and Mr. Henry would leave the door to the motel room open all night, sleeping in shifts. This situation is unsafe, as anyone could have walked into the motel room at any

---

[7] Unpublished memoranda decisions of the Superior Court, filed after May 1, 2019, may be cited for persuasive value. **See** Pa.R.A.P. 126(b).

time of the night, presenting a [risk of] harm to [] Children. Additionally, the family was seemingly at [] constant risk of being evicted from the motel. [Mother] and [] Children both reported to BCCYS caseworkers about the family's frequent conflicts with the motel owner, … which added an extra element of insecurity to the family's housing situation.

Once [the family] vacated their room at the Cab Motel, they began living in tents on the property of Ms. Ketenberg…. [Mother] did not have a lease to live on this land, much like the mother in *K.B.* … [T]he tents lacked any bedding …. Further, the availability of restrooms at this location made housing all the more unsuitable, as [] Children were only allowed to use the bathroom in Ms. Ketenberg's [fitness center] to defecate, not to urinate. [] Children were permitted to take a shower on only one occasion while the family resided there. Though [Mother] denied this accusation, she did specify that they were permitted to use the bathroom in the [fitness center] "[i]f they had to use number two or anything like that, if it was an emergency," then adding[,] "But we are an off-grid, like we're a bushcrafting family, so we always taught [Children] how to survive and be self-sufficient off the land." N.T., 8/6/25, at 55-56. The fact that [Mother] specified both that [] Children were permitted to use the bathroom in an emergency, and that [] Children were taught how to live off the land[,] seems to indicate that the trips to the [fitness center] bathroom were in fact limited and conditional, and that [] Children were encouraged to relieve themselves outside when possible.

[Mother] stated that she was in the process of obtaining a lease to rent an apartment in Emmaus, Pennsylvania, but she had not, at the time [of] the adjudication [hearing], obtained such a lease. Accordingly, the clear and convincing evidence provided of unsuitable housing led [the c]ourt to believe that [] Children's "health, safety, and welfare" were at risk.

Juvenile Court Opinion, 9/18/25, at 11-12 (some citations modified).

Next, the juvenile court found that Mother had failed to attend to Children's medical or educational needs. *Id.* at 12-15. The juvenile court found that Mother "has not scheduled or facilitated the attendance of [] Children at dental or medical appointments for several years." *Id.* at 12. The

juvenile court further noted that, while Mother claimed to have implemented an appropriate homeschool curriculum for Children, it did not find Mother's testimony credible. *Id.* at 14-15 (opining that Mother "appeared to be answering the [juvenile c]ourt's questions in the way that she believed the [c]ourt would want them to be answered, and did not provide much clarity.").

The juvenile court additionally found Children dependent based upon Mother's failure to provide Children adequate subsistence, noting Children reported their hunger to BCCYS on more than one occasion, and indicated on July 25, 2025, that the only food available to Children were condiment packets. *Id.* at 15-16.

Finally, the juvenile court determined that Mother's mental health and "volatile relationship with Mr. Henry [] created an unsafe environment for [] Children, making dependency proper." *Id.* at 16. The juvenile court cited the aggressive altercations between Mother and Mr. Henry, as well as the following incident Mother recounted to Ms. Cox:

> [O]n July 11, 2025, [Mother] took [] Children "stargazing" late at night to get away from Mr. Henry after a fight. N.T., 8/6/25, at 17. While [Mother and Children] were on their late[-]night walk, [Mother] began to either smell smoke or fog … and felt the ground begin to shake. [Mother] stated that … she could "feel the [vibes]." *Id.* at 17-18. Responding to this [] phenomen[on], [Mother] commanded that [] Children run, and they took refuge in the foyer of a complete stranger, where they were found the next morning, having fallen asleep. *Id.* at 18.

- 16 -

Juvenile Court Opinion, 9/18/25, at 16-17 (record citations added). The juvenile court explained that this incident caused the court "deep concern for the safety of [] Children." *Id.* at 17.

The juvenile court's findings are supported by the record, and its legal conclusion is sound. *See S.K.*, 331 A.3d at 80. As described in detail above, the record amply supports the juvenile court's finding that Children were "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for [their] physical, mental, or emotional health, or morals." 42 Pa.C.S.A. § 6302. Mother's first issue merits no relief.

In her second issue, Mother argues the juvenile court erred by removing Children from her care. Mother's Brief at 47. Mother acknowledges her "loss of housing," but emphasizes that she "planned a tent camping vacation[,] for [the] 2-3 weeks before school started[,] as an adventure so that [] Children would not be homeless." *Id.* Mother claims this period of homelessness was temporary, and that she "was working on arrangements for new housing [and] made plans to have the family stay with [m]aternal [g]randmother … while Mother and [Mr. Henry] worked on the apartment …." *Id.* at 47-48.

Mother contends BCCYS's failure to "offer preventative services" was unreasonable under the circumstances. *Id.* at 48. Mother further faults the juvenile court for "removing [] Children from [Mother's] care without considering alternate family resources …." *Id.* According to Mother, she

- 17 -

presented maternal grandmother "as a stable living circumstance, but adjudication occurred prior to [BCCYS] vetting [maternal g]randmother." ***Id.***

As stated above, we review dependency determinations for an abuse of discretion. ***S.K.***, 331 A.3d at 80. "An abuse of discretion is not merely an error of judgment, but is, *inter alia*, a manifestly unreasonable judgment or a misapplication of law." ***Interest of M.G.***, 331 A.3d 703, 718 (Pa. Super. 2025) (quotation marks and citation omitted).

We have observed that,

> [i]f the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or a private or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S.A. § 6351(a).

***Id.*** at 717-18 (some citations omitted).

"The health, safety and welfare of a child involved in juvenile court proceedings is one of the foremost considerations contemplated by the Juvenile Act." ***In re J.A.***, 107 A.3d 799, 814 (Pa. Super. 2015) (citing 42 Pa.C.S.A. § 6301(b)(1.1)). Consequently, "[w]hen a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved." ***In re J.J.***, 69 A.3d 724, 732 (Pa. Super. 2013) (citations omitted).

After a child is adjudicated dependent,

> a court may not separate that child from the parent unless it finds that the separation is clearly necessary. ***Interest of N.S.***, 237

- 18 -

A.3d 546, 551 (Pa. Super. 2020) (citations omitted). Such necessity is implicated where the welfare of the child demands that they be taken from their parents' custody. *Id.* (citation omitted). "Clear necessity" is established when the court determines that alternatives are not feasible. *Id.* (citing *A.N. v. A.N.*, 39 A.3d 326 (Pa. Super. 2012)).

*M.G.*, 331 A.3d at 718.

In conducting its dispositional analysis,

the juvenile court must decide "whether reasonable efforts were made prior to the placement of the child to prevent or eliminate the need for removal of the child from his home." 42 Pa.C.S.A. § 6351(b)(2). … By requiring reasonable efforts, the statute recognizes that there are practical limitations to such efforts."

*Id.* (some quotation marks and citations omitted).

Instantly, the juvenile court offered the following rationale in support of

its decision to remove Children from Mother's care:

The [juvenile c]ourt[ determined] that to remain with [Mother] would "be contrary to the Child[ren]'s welfare." 42 Pa.C.S.A. § 6351(b). Reasonable efforts to prevent placement were not made, but that was due to the emergency nature of the need for removal. [] Children had not been fed appropriate amounts of food, and [Mother] was continually trying to avoid BCCYS. If emergency custody had not been granted, it was not clear how long it would be before [Mother] and [] Children resurfaced, and when they did, what condition [] Children would be in. Nonetheless, reasonable efforts were being made to allow reunification with [Mother], in the form of court-ordered services. *See* Dependency Order, 8/8/25, at 2-3. ….

Juvenile Court Opinion, 9/18/25, at 20 (citations modified).

We discern no abuse of discretion and agree with the juvenile court's

finding that the emergent nature of the circumstances necessitated Children's

placement outside of Mother's care. The record discloses that (1) BCCYS had

- 19 -

difficulty contacting Mother throughout its investigation; (2) after obtaining the first EPO, Mother refused to reveal to BCCYS where Mr. Henry had taken Children; and (3) Mother and Children were homeless. N.T., 8/6/25, at 15, 23-24, 40-41. Further, Mother admits that the dependency hearing occurred before BCCYS could "vet" maternal grandmother as a safe and appropriate resource for Children. Mother's Brief at 48. Under these circumstances, the juvenile court reasonably concluded that placement with BCCYS was in Children's best interest. *See J.J.*, 69 A.3d at 732. Mother's second issue entitles her to no relief.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/28/2026